In re Application of the UNITED STATES of America FOR AN ORDER AUTHORIZING THE INSTALLATION AND USE OF A PEN REGISTER AND TRAP AND TRACE DEVICE.

No. 94–3–CR–MISC–T–23.

United States District Court,
M.D. Florida,
Tampa Division.

March 14, 1994.

Kathy Peluso, Asst. U.S. Atty., Tampa, FL, for plaintiff.

### OPINION AND ORDER

MERRYDAY, District Judge.

The magistrate judge has twice denied the United States' application for an order autho-

rizing the installation and use of a pen register and trap and trace device.[1] The latter of the two applications, a somewhat supplemented edition of the earlier application, states in part that:

> Applicant certifies that the Federal Bureau of Investigation, United States Customs Service, * * * * * County Sheriff's Office and * * * * * Police Department are conducting a criminal investigation of * * * * *, owner/operator of * * * * *, located in * * * * *, Florida; employees of * * * * * located at * * * * *, and others known and unknown, in connection with possible violations of, *inter alia,* Title 21, United States Code, Sections 846 and 841(a)(1), occurring within the Middle District of Florida and elsewhere; that it is believed that the subjects of the investigation are using telephone number (* * *) * * *-* * * *, listed in the name of * * * * * and located at * * * * *, in furtherance of the subject offenses; and that the information likely to be obtained from the pen register and trap and trace device, that is, a caller ID device, is relevant to the ongoing criminal investigation being conducted by the aforementioned law enforcement agencies in that it is believed that this information will concern the aforementioned offenses.

> This Court has jurisdiction to issue an order authorizing the installation and use of the requested pen register and trap and trace device in that the actual pen register equipment and trap and trace device which will be used to monitor telephone number (* * *) * * *-* * * * [and] will be installed and used at the * * * * * County Sheriff's Office located in * * * * * County, within the Middle District of Florida. *United States v. Burford,* 755 F.Supp. 607, 611 (S.D.N.Y.1991) (District Court in the Southern District of New York had juris-

diction to issue order authorizing installation and use of pen registers where pen register device was actually "installed and used" at DEA headquarters in New York, even though the telephones being monitored were located in Maryland.), *aff'd without opinion,* 986 F.2d 501 (2d Cir. 1992), *and* 990 F.2d 624 (2d Cir.1993).

. . . .

> Applicant knows that there are incoming telephone calls to telephone number (* * *) * * *-* * * * and believes the identification of the calling telephone facility will be relevant to the ongoing criminal investigation and that this information will concern the aforementioned offenses.[2]

The magistrate judge premised his denial on the failure of the United States to advance a "factual demonstration that the pen register is likely to disclose information relevant to an ongoing criminal investigation that has a nexus to the Middle District of Florida." (The magistrate judge's opinion is attached as Exhibit A.) The magistrate judge determined that the statute governing the installation and use of pen registers requires a demonstration of qualifying facts sufficient to establish the correctness of both the United States' assertion of this court's jurisdiction and the pen register's purpose and probable results, i.e., the discovery of information beneficial to an investigation with a nexus to the Middle District of Florida. Asserting energetically that the pen register statute envisions only perfunctory judicial involvement, the United States appeals to the district court. The magistrate judge's order is REVERSED because the application of the United States satisfies the requirements of the applicable statute.

## I.

■ In *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), a rob-

---

**1.** Throughout the remainder of this Order, reference to the pen register and trap and trace device is shortened to "pen register" in the interest of convenience. A pen register is "a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached...." 18 U.S.C. § 3127(3). A trap and trace device "captures the incoming electronic or other impulses which

identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C. § 3127(4).

**2.** Because the original of this order is filed *in camera* and relates to an ongoing criminal investigation, any revealing and identifying words are replaced by asterisks.

bery victim received threatening telephone calls after describing to police the automobile she believed the robbers had driven. The telephone company honored a warrantless and judicially unapproved request from the police to install a pen register to record telephone numbers called from the telephone at the home of a suspect. The pen register recorded a call to the robbery victim, on the strength of which law enforcement procured a warrant, effected a search of the suspect's residence, and arrested the suspect, who was identified in a line-up.

After the suspect's conviction, he sought review of the trial court's denial of his motion to suppress both the pen register results and other incriminating, derivative evidence. Maryland's appellate court affirmed both the conviction and the trial court's denial of the suppression motion. Citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), as the principally controlling precedent and affirming Maryland's decision, the Supreme Court expounded the regnant considerations:

> In applying the *Katz* analysis in this case, it is important to begin by specifying precisely the nature of the state activity that is challenged. The activity here took the form of installing and using a pen register..... Given a pen register's limited capabilities, petitioner's argument that its installation and use constituted a "search" necessarily rests upon a claim that he had a "legitimate expectation of privacy" regarding the numbers he dialed on his phone.
>
> This claim must be rejected. First, we doubt that people in general entertain any actual expectation of privacy in the numbers they dial. All telephone users realize that they must "convey" phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed. All subscribers realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills. In fact, pen registers and similar devices are routinely used by telephone companies "for the pur-

> poses of checking billing operations, detecting fraud and preventing violations of law." [citation omitted] Electronic equipment is used not only to keep billing records of toll calls, but also "to keep a record of all calls dialed from a telephone which is subject to a special rate structure." [citation omitted] Pen registers are regularly employed "to determine whether a home phone is being used to conduct a business, to check for a defective dial, or to check for overbilling." [citation omitted] Although most people may be oblivious to a pen register's esoteric functions, they presumably have some awareness of one common use: to aid in the identification of persons making annoying or obscene calls. [citations omitted] Most phone books tell subscribers, on a page entitled "Consumer Information," that the company "can frequently help in identifying to the authorities the origin of unwelcome and troublesome calls." [citation omitted] Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.

> . . . .

> Second, even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not "one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516. This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties....

> . . . . When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business....

. . . .

We therefore conclude that petitioner in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and that, even if he did, his expectation was not "legitimate." The installation and use of a pen register, consequently, was not a "search," and no warrant was required.

442 U.S. at 739–46, 99 S.Ct. at 2580–83, 61 L.Ed.2d at 230. *See also United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1223 (11th Cir.1993) (no reasonable expectation of privacy while operating a "beeper"); *United States v. Thompson,* 936 F.2d 1249, 1250 (11th Cir.1991) (follows *Smith* and finds no exclusionary rule extending to pen registers).

*Smith* compels the conclusion that (absent some presently unforeseen, aggravating circumstance) no constitutionally cognizable issues inhere in law enforcement's resort to a pen register. The result in *Smith* is as definitive as the result in a case at common law is likely to be. The Supreme Court has ruled dispositively. Orderliness requires good faith compliance from the lower courts. While the possibility exists that some fairminded and reasonable jurists remain uneasy about the result in *Smith,* the nature of finality in cases presenting litigable constitutional issues precludes further debate about the effect of *Smith* (excluding, of course, the everlasting but imponderable effect of changes in the composition and disposition of the Supreme Court).[3]

**3.** In dissent, three Justices argued that the public reasonably expects the numbers dialed on a telephone to remain private.

**4.** Section 3123(a) of Title 18 of the United States Code states:

Upon an application made under section 3122 of this title, the court shall enter an ex parte order authorizing the installation and use of a pen register or a trap and trace device within the jurisdiction of the court if the court finds that the attorney for the Government or the State law enforcement or investigative officer has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

Section 3123(b) of Title 18 of the United States Code states:

An order issued under this section—

(1) shall specify—

## II.

■ In 1986, Congress enacted 18 U.S.C. §§ 3121–27, which governs pen registers.[4] Section 3121(a) provides, with a few irrelevant exceptions, that "no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801, *et seq.*)." Pursuant to Section 3121(c), the penalty for violation of the statute is imprisonment for not more than one year, a fine, or both.

Section 3122(a) authorizes an attorney for the United States to apply for an order, "in writing, under oath or equivalent affirmation, to a court of competent jurisdiction." First, Section 3122(b)(1) requires the application to include both the identity of the applying attorney and the identity of the law enforcement agency conducting the investigation. Second, Section 3122(b)(2) requires the application to include a certification by the attorney "that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency."

Section 3123(a) states that, after a complying application:

[T]he court shall enter an ex parte order authorizing the installation and use of a pen register or a trap and trace device

(A) the identity, if known, of the person to whom is leased or in whose name is listed the telephone line to which the pen register or trap and trace device is to be attached;

(B) the identity, if known, of the person who is the subject of the criminal investigation;

(C) the number and, if known, physical location of the telephone line to which the pen register or trap and trace device is to be attached and, in the case of a trap and trace device, the geographic limits of the trap and trace order; and

(D) a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates; and

(2) shall direct, upon the request of the applicant, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device under section 3124 of this title.

within the jurisdiction of the court if the court finds that the attorney for the Government ... has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

Section 3124 requires that providers of telephone services and other persons, if the court so orders, must assist with the installation of the pen register. Section 3124(e) provides to any cooperating person a complete defense against either civil or criminal liability, if the person relies in good faith on a court order authorizing the pen register.

A review of these provisions demonstrates that Congress, absent Fourth Amendment concerns, intended to require an identified and presumably responsible official to attest the facts supporting the pen register application. The salient purpose of requiring the application to the court for an order is to affix personal responsibility for the veracity of the application (i.e., to ensure that the attesting United States Attorney is readily identifiable and legally qualified) and to confirm that the United States Attorney has sworn that the required investigation is in progress.[5] Section 3122(b) requires only identification and certification by the official applying for the order. Section 3123(a) requires only confirmation by the court that identification and certification have occurred. No provision appears for independent judicial inquiry into the veracity of the attested facts. As a form of deterrence and as a guarantee of compliance, the statute provides instead for a term of imprisonment and a fine as punishment for a violation.

Requiring identification and certification, but nothing further, admittedly extends only minimal protection to whatever privacy expectations attend the dialing of a telephone number. On the other hand, prompt availability of pen registers usefully expedites law enforcement with no countervailing loss, the Supreme Court instructs, of the Fourth

Amendment's protections against search and seizure. In other words, the statute's structure balances the need for accountability, the legitimate interest of law enforcement in advancing a criminal investigation, and the residual privacy interest of the public.

## III.

■ A comparison of the statute governing wiretaps, 18 U.S.C. §§ 2510–21, with the statute governing pen registers demonstrates that Congress intended only minimal safeguards against the unwarranted use of a pen register. The procedure for obtaining authorization for a pen register is summary in nature and the requisite disclosure is perfunctory. In contrast, the wiretap statute provides formidable procedural protections and requires extensive and detailed information in the application. Perhaps most pertinent to this order is the presence of the following provision in Section 2518(2) of the wiretap statute:

The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.

No similar provision for additional judicial inquiry appears in the pen register statute, indicating that Congress intended no focused judicial scrutiny of an application for a pen register (at least at the time of the application). The legislative history of the pen register statute contains a similar signal:

To issue an order [authorizing a pen register], the court must first be satisfied that the information sought is relevant to an ongoing criminal investigation. This provision does not envision an independent judicial review of whether the application meets the relevance standard, rather the court needs only to review the completeness of the certification submitted.

S.REP. No. 541, 99th Cong., 2d Sess. 47,

---

5. The statute's ancillary purpose is to wholly exonerate providers of telephone service from civil or other liability arising from compliance with a judicially approved pen register order. Another, from among several, possible explanations for a limited judicial role in pen register applications is merely to permit Congress to ac-

cumulate reliable statistics on the frequency and usefulness of pen registers, thereby enabling Congress to evaluate the balance between the interests of law enforcement and the residual, non-constitutional interests of privacy implicated by use of telephones and pen registers.

*reprinted in* 1986 U.S.C.C.A.N. 3555, 3601.[6]

Under Section 2518(1)(b) of the wiretap statute, an application must contain "a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued," including details of the offense, the sites of the interception devices, the type of communication subject to interception, and the identity of the person whose communications are subject to interception. Section 2518(1)(c) requires that a wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Section 2518(d) requires a prediction of the duration of the wiretap and Section 2518(e) requires a statement of the circumstances of any previous wiretap applications involving the same person or place. Section 2518(f) provides that, if the application extends a previous authorization, the application must contain "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."

■ By comparison, an application for a pen register includes only the identification and certification required by Section 3122(b). No requirement exists for a pen register applicant to unsuccessfully attempt other investigative techniques or to explain the failure to attempt other investigative techniques. Section 3123(c)(2) permits a pen register applicant to obtain an extension of an authorizing order by providing the same identification and certification required by the initial application.[7] The statute excludes any requirement that an applicant for an extension set forth either the results previously ob-

tained or an explanation for the failure to obtain results.

■ Other comparisons are similarly instructive. To authorize a wiretap, the court must find (1) probable cause to believe that an individual has committed, is committing, or imminently will commit an offense listed in the statute, (2) probable cause to believe that the intercepted communications will relate to the alleged offense, (3) probable cause to believe (with limited exceptions) that the communications facilities subject to the wiretap are being used in connection with the offense, and (4) that other investigative procedures have failed, are likely to fail, or will be too dangerous. To authorize a pen register, the court need not find any of these facts. The pen register statute contains no requirement for a finding of "probable cause," "reasonable suspicion," or the like.

Section 2518(6) of the wiretap statute permits the court to require periodic reports by the intercepting authorities of the progress of the wiretap. Sections 2518(8)(a) and (d) of the wiretap statute require that the intercepted communications be recorded and maintained both under seal and unedited and that an inventory of the intercepted communications be provided to the subjects after termination of the wiretap. Section 2518(9) of the wiretap statute bars the use of intercepted communications at trial without advance notice. Neither these provisions nor approximations of them appear in the pen register statute.

■ Section 2518(10)(a) of the wiretap statute provides for suppression of evidence obtained by wiretap if the evidence was obtained in violation of the statute. The pen register statute contains no exclusionary remedy, and *United States v. Thompson,* 936

---

6. In addition to creating the pen register statute, the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1848, amended the wiretap statute and contained a few other provisions concerning the protection of electronic communications. A review of the Act and its legislative history reveals that its predominant purpose was to amend the wiretap provisions to ensure that they advanced *pari passu* with communications technology and changes in the communications industry. *See, e.g.,* S.REP. NO. 541 at 2–3, *reprinted in* 1986 U.S.C.C.A.N. at 3556–

57. As the magistrate judge points out in his order, the pen register provisions are incidents arising from the Act.

7. In Case No. 93–15–Misc–T–21, United States District Judge Ralph W. Nimmons disposed conclusively of the issue concerning the availability of extensions of pen register orders beyond a cumulative term of sixty days. I concur in his opinion, which is attached to and incorporated by reference into this opinion as Exhibit B.

F.2d 1249 (11th Cir.1991), declines to create a common law rule of exclusion.

As punishment for an unlawfully obtained wiretap, Section 2511(4)(a) of the wiretap statute provides a maximum penalty of imprisonment for five years and a fine. As noted already, Section 3121(c) provides that the maximum penalty for violation of the pen register statute is imprisonment for one year and a fine. Section 2520 of the wiretap statute also authorizes recovery of civil damages, including statutory damages of up to $10,000.00, punitive damages, equitable relief, and recovery of costs and attorney fees. The pen register statute contains no provision for recovery of civil damages.

The breadth and intricacy of the wiretap statute illustrate that Congress, when electing to do so, conceived and implemented formidable safeguards, including extensive judicial review, for the protection of electronic communications. Congress elected to provide only minimal regulation of the use of pen registers. Absent recognized constitutional considerations, the court should create and implement by decisional law no more extensive restrictions on the use of pen registers than Congress has provided explicitly in the governing statute after consideration in gross of all the pertinent factors, not the least of which is privacy.

## IV.

No judicial imprimatur on pen registers is required, permitted, or implied under the pen register statute. The court is not asked to "approve" the application for a pen register in the sense that the court would vouch initially for the propriety of the use of a wiretap. Congress asks the court only to confirm that the approved safety measures are observed—that is, primarily, that the responsible persons are identified and accountable if any malfeasance or misprision comes to light and that the nature of that misconduct is readily provable. Undoubtedly, Congress knew that providing to a court false information about the nature of an investigation is an offense which, especially if committed by a United States Attorney, is due for a most unforgiving penalty.

Far from compromising the judiciary, the statutory procedure removes the court from unnecessary entanglement in decisions properly residing in the first instance in law enforcement and prosecuting authorities, yet subject to judicial inquiry at the end of the day. The judiciary is not the daily supervisor of the prosecutor. The judiciary should maintain a sanitary distance from law enforcement. The more the court is insinuated unduly into an *ex parte* inquiry conducted *in camera*, the more the independence of the judiciary is compromised. Serious Fourth Amendment concerns commend, in fact compel, a routinely undesirable, *ex parte* inquiry before the authorization of an arrest, a search, or a wiretap. But this is not so for the authorization of a mere pen register, which presents no privacy issue that rises to Fourth Amendment severity. On behalf of judicial independence, the court is better kept safely apart from the investigatory function unless some constitutional matter (or statutory, if Congress so declares) warrants intrusion. Only in this way is independence and integrity maintained.

The matter of judicial integrity and independence serves, on balance, to separate my conclusion from the magistrate judge's conclusion. He concludes that authorizing a pen register based on no more than the certification of a United States Attorney and without judicial scrutiny breeds suspicion and implies a compromise of independence. I conclude that undue entanglement with the prosecutor, if not required by constitutional matters, breeds suspicion and implies compromise. *Ex parte* and *in camera* hearings, I conclude, amplify those unsavory appearances, if they exist at all.

I conclude that the independence and integrity of the judiciary is best served by preserving, free of any undue entanglement and until a later stage, the oversight function of the court. This is the general rule. Exceptions appear for an arrest, a search, a wiretap, and for certain aspects of the grand jury's proceedings. However, at each stage for which an exception appears, the constitution appears also. Similarly, if no constitutional or statutory command appears, the courts must conform to the sharply con-

strained role assigned in pen register cases. To attempt after *Smith* to raise a privacy consideration to sufficient dignity to overcome a direct Congressional limitation is to risk a form of judicial behavior likely to taint integrity more tellingly than the taint, if any, attendant to a mere application for a pen register.[8]

### V.

 In the present case, the magistrate judge rejected the pen register application because the United States, in his view, failed to show that the pen register is "within the jurisdiction of the court" as required by Section 3123(a). The magistrate judge raised this concern because the pen register, which will be located in this district, will monitor a telephone located in the Southern District of Florida. The magistrate judge required "a factual demonstration that the pen register is likely to disclose information relevant to an ongoing criminal investigation that has a nexus to the Middle District of Florida." He determined that the United States failed to show the qualifying facts.

The court finds that the United States has met the requirements of the statute. The application contains the identification and certification required by Section 3122(b). In the certification, an assistant United States Attorney reports that local law enforcement agencies within this district and federal law enforcement agencies, acting in concert, are conducting within this district and within the Southern District an investigation of possible criminal offenses occurring within this district and elsewhere. Part of this investigation is prospectively a pen register installed in a county within the Middle District of Florida. This certification amply demonstrates that the pen register is "within the jurisdiction of the court." No further factual showing is necessary.

8. At footnote 6 of his opinion, the magistrate judge notes that the Electronic Communications Privacy Act of 1986 enjoyed, according to Senator Mathias, the "full support of diverse groups, including the American Civil Liberties Union." This sort of assertion, disfavorably regarded by logicians and other diverse groups, is a mere argument *ad hominem,* from which one deduces nothing reliably.

The order of the magistrate judge denying the application for a pen register is **REVERSED.** The application of the United States is **GRANTED.**

### EXHIBIT A

In re Pen Register.

No. 94–50M–TW.

*ORDER*

THOMAS G. WILSON, United States Magistrate Judge.

This matter came on for consideration upon the Government's application for an order authorizing a pen register and a trap and trace device.[1] Because the application seeks to monitor a telephone in the Southern District of Florida, the Government was directed to justify its extraordinary request. However, the Government, taking the position that it is never required to justify an application for a pen register under any circumstances, has declined to make any showing. Accordingly, the request will be denied.

### I.

The Government in this case submitted what appeared to be a routine application for a pen register and a trap and trace device. The application, however, was for a telephone in Miami, Florida. Nevertheless, nothing in the application suggested that the request was out of the ordinary, even though the pertinent statute merely "authoriz[es] the installation and use of a pen register or a trap and trace device within the jurisdiction of the court." 18 U.S.C. 3123(a).

When this defect was called to the Government's attention, an amended application was filed which asserted that the monitoring equipment would be installed at the Manatee County Sheriff's Office. The Government cited *United States v. Burford,* 755 F.Supp.

1. For convenience, the electronic monitoring involved will generally be referred to simply as a pen register, even though the application here, as in many others, also includes a trap and trace device.

607, 611 (S.D.N.Y.1991), *aff'd without opinion,* 986 F.2d 501 (2d Cir.1992), 990 F.2d 624 (2d Cir.1993), as authority for the position that such an arrangement is permissible. The Government, however, declined to make a showing that the investigation had a nexus to the Middle District of Florida.

The refusal to make a showing is consistent with the applicant's position in another case that, in connection with a request for a pen register application, the Government can never be required to make any showing.[2] In my view, the extraordinary nature of the Government's request raised a concern that warranted at least a minimal showing that the application was legitimately a matter for this court.

## II.

The problems raised by the Government's application are best understood in light of the history of court approval of pen registers.

In 1979, the Supreme Court held that pen registers are not searches within the Fourth Amendment and thus do not require a warrant for installation. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). Nevertheless, after that decision, the Government continued to seek court orders authorizing pen registers, at least in this district.[3] The Government's applications, typically based upon the All Writs Act, 28 U.S.C. 1651(a), *see United States v. New York Telephone Company,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), contained a showing supporting each request, although

that showing did not necessarily reach the level of probable cause.

In 1986, Congress enacted in the Electronic Communications Privacy Act a statutory framework for the authorization of pen registers and trap and trace devices. 18 U.S.C. 3121, *et seq.* Under the Act, a federal government attorney or a state law enforcement officer (unless prohibited by state law) could make an *ex parte* application for a pen register simply by identifying themselves and the law enforcement agency conducting the investigation and by certifying that "the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." 18 U.S.C. 3122. Under the terms of the statute, a court receiving such an application is merely to determine whether the applicant had made the necessary certification. 18 U.S.C. 3123(a). As the Senate Report makes clear, "This provision does not envision an independent judicial review of whether the application meets the relevance standard, rather the court needs only to review the completeness of the certification submitted." S.Rep. No. 99–541, 99th Cong., 2d Sess. 47 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3601. Since it is virtually impossible to botch the simple certification, the court under the Act seemingly provides nothing more than a rubber stamp.[4]

The apparent absence of any meaningful judicial review raised, at least in my mind, the question of the purpose of the pen register provision of the Electronic Communications Privacy Act.[5] After all, the existing non-statutory practice involved judicial re-

**2.** In Case No. 93–477M–TW, the Government declined to make a showing justifying a second extension of a pen register and a trap and trace device. In light of the lack of a showing, the extension was denied. The Government has appealed that denial.

**3.** In the last quarter of 1985, for example, I issued 15 orders authorizing pen registers.

**4.** In actual practice the certification sentence has always been correct, but from time to time the applications contain typographical errors, which are called to the Government's attention and corrected. In other words, my review is limited to proof-reading. Those typographical errors, coupled with occasional requests involving the wrong phone number, indicate that pen register

applications are not given close attention by the United States Attorney's Office. This factor increases the concern that, without independent judicial review, the authorization of pen registers is subject to misuse and abuse.

**5.** It could conceivably be argued, in light of 18 U.S.C. 3121(a), which prohibits the installation of pen registers without a court order, that the purpose of the pen register provision was to protect against misuse of pen registers by private citizens. But I have never seen any indication that pen registers were subject to misuse by private individuals, and the legislative history does not suggest the existence of such a problem. Thus, the pen register provisions of the Act cannot plausibly be said to have been directed to that concern.

view and thus provided appropriate protection for telephone subscribers. I found it extremely hard to believe that Congress would take the time and trouble to enact an empty statutory scheme, especially since such a scheme virtually eliminated existing protection for the public. Moreover, the inclusion of such a scheme in a "Privacy" act seemed particularly cynical.[6]

### III.

The concerns raised by the pen register provisions are not removed simply because a pen register is not as intrusive as a wire-tap. In my view, citizens ordinarily would be annoyed, and probably outraged, by government monitoring of their telephone calls through pen registers and trap and trace devices, especially if it continued for an extended period of time. As Justice Stewart stated in *Smith v. Maryland, supra,* 442 U.S. at 748, 99 S.Ct. at 2584 (dissenting opinion):

> Most private telephone subscribers may have their own numbers listed in a publicly distributed directory, but I doubt there are any who would be happy to have broadcast to the world a list of the local or long distance numbers they have called. This is not because such a list might in some sense be incriminating, but because it easily could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life.

In the same case, Justice Marshall added, *id.* at 751, 99 S.Ct. at 2586 (dissenting opinion):

> The prospect of unregulated governmental monitoring will undoubtedly prove disturbing even to those with nothing illicit to hide. Many individuals, including members of unpopular political organizations or journalists with confidential sources, may legitimately wish to avoid disclosure of their personal contacts.

Furthermore, it would be profoundly naive to rely solely upon the good faith and judgment of government attorneys and state law enforcement officers to guard against abuses of the pen register procedure. Justice Marshall, for example, has noted "the Government's previous reliance on warrantless telephonic surveillance to trace reporters' sources and monitor protected political activity." *Smith v. Maryland, supra,* 442 U.S. at 751, 99 S.Ct. at 2586 (Marshall, J., dissenting). Other excesses of prosecutorial and investigative zeal come readily to mind. Consequently, only independent judicial review can provide meaningful protection against abuse and misuse of the pen register procedures.

Under the Government's interpretation of the pen register provisions, however, the court has no power to exercise independent review, even if an apparent abuse is seen on the face of the application. Thus, to take the matter of the out-of-district authorization that is at issue here, according to the Government, the court could not question the request even if it appeared to be the most blatant form of forum shopping. Similarly, under the Government's view, the court is without authority to inquire into the legitimacy of an application involving such telephone subscribers as a local newspaper, a political party, a judicial officer, or a spouse of the applicant.

In sum, the pen register provisions of the Act, as construed by the Government, provide no protection to members of the public from abuse of pen registers and leave them worse off than they were under the pre-Act practice. But that is not the full extent of the mischief. Under the Government's view, Congress has compelled the courts to place their imprimaturs upon pen register authorizations while prohibiting the courts from inquiring whether the authorizations are legitimate.

The involvement of the courts in a very dubious procedure could seriously affect the integrity of the judiciary. In the event an abuse of the pen register procedures should come to light, the court that authorized the pen register would be exposed to public criticism and would have no ability to respond that under the Act it was compelled to sign

---

**6.** My strong skepticism that Congress could have intended such a vacuous scheme is confirmed by the statement of Senator Mathias, a sponsor of the bill, that the legislation enjoyed the full support of diverse groups, including the American Civil Liberties Union. *See* 132 Cong.Rec. S14441–04.

the order. The public, furthermore, would not likely comprehend a response that a court, under § 3123, is nothing more than a rubber stamp.

## IV.

The foregoing concerns undoubtedly prompted the ruling of the Ninth Circuit in *United States v. Doe,* 967 F.2d 593 (9th Cir.1992) (table), 1992 WL 144650, that a district court has authority to make a limited inquiry into the validity of a pen register application. In that case, the Government had made a factual showing in connection with its application for a pen register, but the district court appeared to have required a showing of at least reasonable suspicion. In holding that a showing to that extent was not appropriate, the court of appeals stated (1992 WL 144650, **2):

> While the district court's role is limited, the court is not simply a rubber stamp. If it were, we would confront serious separation of powers problems. Congress involved the district court for a purpose: to constrain unfettered authority in the prosecutor to order a telephone company to install pen registers. Congress intended to provide a measure of protection to both the utility and its customers. However, that protection is narrow. Congress viewed the intrusion on individual privacy as limited and it was concerned that the prosecutor's investigative powers not be interfered with unduly. The district court judge must make sure that every statutorily required element of the certification is provided and is complete. Where the district court has a reasonable concern about the truth of any element, it may make reasonable inquiry. If not reasonably satisfied, the court may decline to issue the order. The court "must be satisfied that the information sought is relevant to an ongoing criminal investigation ..." but Congress did "not envision an independent judicial review of whether the application meets the relevance standard." This is a fine line.

The Ninth Circuit, in other words, concluded that, if a court has concerns about an application, it can make a reasonable inquiry in order to be satisfied that the information sought is relevant to an ongoing criminal investigation, but that otherwise judicial review is not warranted.

The same result is yielded by a consideration of the court's inherent authority to preserve the integrity of the judicial process. That authority is plainly called into play by a statutory scheme that directs a court to enter an order upon a simple certification and makes no provision for judicial inquiry into the propriety of that order.

The Supreme Court has recognized that federal courts in the exercise of supervisory powers may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). One of the purposes for the use of such power is to preserve judicial integrity. *Id.* Accordingly, the court of appeals has pointed out, for example, that the exercise of a court's general supervisory power to protect the integrity of the judicial process could be employed to remedy an abuse of the court's subpoena power. *United States v. Elliott,* 849 F.2d 554, 557 (11th Cir.1988). Similarly, a court should not be obligated to sign a pen register authorization unless it can exercise its inherent authority to dispel concerns about the propriety of the request.

An exercise of a court's supervisory power, it is noted, is not valid if it conflicts with constitutional or statutory provisions. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988). That principle, however, does not preclude the use of the court's supervisory power in these circumstances because there is nothing in the Electronic Communications Privacy Act that prohibits a court from requiring an appropriate showing in connection with an application for a pen register. The pen register provisions, which plainly were an incidental part of the Act, were merely designed to set up a statutory framework for obtaining pen register authorizations. *See* 132 Cong.Rec. S14441–04. The comment in the Senate Report that "the provision does not envision an independent judicial review" and that "the court needs

only to review the completeness of the certificate" is most reasonably read as an explanation that Congress did not view the authorization of pen registers as entailing a significant amount of judicial labor. The comment does not reflect any prohibition against a court undertaking review if it elected to do so. Moreover, if Congress had intended to create a truly remarkable scheme that prohibited the exercise of judicial review in connection with the issuance of an order, it almost certainly would have given some indication in the legislative history that it was doing so.

A prohibition against judicial review is also inconsistent with the provision that an order for a trap and trace device shall specify "the geographic[al] limits of the ... order." 18 U.S.C. 3123(b). In this case, for example, the Government requests that the trap and trace order extend to the continental United States, but provides no justification for that broad request. The lack of justification is undoubtedly based on the Government's position that it need never make any showing to obtain an order authorizing a trap and trace device. Congress, however, surely could not have intended a scheme that requires a court order to specify limits of trap and trace monitoring, but forbids the court from obtaining information upon which to base those limits. Thus, some type of showing and judicial review seems necessary for the entry of a valid trap and trace order. That being so, it is unreasonable to think that Congress foreclosed judicial review with respect to pen registers, which generally are the mirror image of trap and trace devices.

Additionally, a "serious separation of powers problem," as the Ninth Circuit has noted, would be presented by a provision that compels a court to issue an order, but precludes it from determining whether the order is legitimate and reasonable. *United States v. Doe, supra,* 1992 WL 144650, at **2. While the Tenth Circuit has rejected a separation

of powers challenge to § 3123, it did so by leaving open the question whether a court may inquire into the Government's factual basis for the request. *United States v. Hallmark,* 911 F.2d 399, 402 n. 3 (10th Cir.1990). Furthermore, the Tenth Circuit's rejection of the separation of powers argument is unpersuasive since it was summarily done and based upon cases that are clearly inapposite.[7] Consequently, there would exist, as the Ninth Circuit said, a "serious separation of powers problem" if the pen register provision is interpreted to prohibit the exercise of judicial review when pen register applications are considered. The appropriate approach in that situation is to construe the statute, if it can be reasonably done, in a manner that will avoid the constitutional problem. *See Ullmann v. United States, supra,* 350 U.S. at 433, 76 S.Ct. at 503–504. Since there is no express language in the statute or in the legislative history prohibiting judicial review, the statute, in order to eliminate the constitutional issue, should be read not to preclude such review.

### V.

This court, therefore, has the power, either under the Ninth Circuit's interpretation of the Act, or under its own inherent authority, to require an appropriate showing by the Government in order to remove any reasonable concerns it may have about the propriety of the issuance of a pen register authorization. This conclusion does not contemplate that in the ordinary case a showing would be required upon the initial application. Indeed, in view of the extremely meager information provided in the application, concerns about a pen register authorization would be raised only very rarely.

In this case, however, the Government, for the first time ever in my experience, has asked for a pen register and a trap and trace device on a telephone located outside the

---

7. The Tenth Circuit cited two cases on this point. The first, *Ullmann v. United States,* 350 U.S. 422, 431–434, 76 S.Ct. 497, 504, 100 L.Ed. 511 (1956), dealt with the issue whether the court's role in grants of prosecutorial immunity was within the scope of "judicial Power" under the Constitution. This is plainly a different question

than whether a congressional prohibition against the exercise of judicial power violates the Constitution.

The second case cited by the Tenth Circuit, *United States v. Taylor,* 728 F.2d 930, 934 (7th Cir.1984), did not address a separation of powers argument at all.

district. That fact immediately raises the question of why the request is not being made in the district where the phone is located. The significance of that question is heightened by the statutory provision that only authorizes the use and installation of pen registers and trap and trace devices "within the jurisdiction of the court." 18 U.S.C. 3123(a). This limitation would seemingly be rendered meaningless if the statute can be satisfied by the simple expedient of placing the recording devices at some office outside the district where the phone is located, and then seeking the authorization from the district court where the recording equipment is placed, as the Government proposes here. It is recognized that there is authority supporting this approach, but that authority is sparse and lacking in analysis. *United States v. Rodriguez*, 968 F.2d 130, 135 (2d Cir.1992), *cert. denied*, —— U.S. ——, ——, 113 S.Ct. 139, 140, 663, 121 L.Ed.2d 92; *United States v. Burford, supra.*[8] In short, the Government's application raises a serious question of statutory construction. However, before that question is tackled, the Government should be required to address the initial question of why this matter is being presented to this court and not to the district court in the Southern District of Florida. If the Government cannot make a showing that demonstrates that this application is legitimately a matter for this court's consideration, there would be no need to resolve the jurisdictional issue.

Furthermore, the requirement of a showing imposes no substantial burden upon the Government. The showing contemplated is simply a factual demonstration that the pen register is likely to disclose information relevant to an ongoing criminal investigation that has a nexus to the Middle District of Florida. It is hard to understand the Government's adamant opposition to this minimal showing. By way of contrast, the United States Attorney's Office for the Southern District of California submitted a factual showing in *United States v. Doe* with its initial application.

8. Moreover, at least in *Rodriguez* the evidence showed that the pen register was situated in the district that was the focus of the criminal activi-

In this case, the Government was advised by telephone that the application lacked an appropriate showing of a relationship to this jurisdiction. The Government, however, declined to make any showing. This apparently was based upon its position that no showing is ever required under any circumstances. This complete rejection of judicial review is, for the reasons previously explained, unreasonable and not required by statute. Further, on the most elementary level, the Government's position is unacceptable because it means that a judicial officer must place his or her signature on an order that directly intrudes upon an individual's private life without being permitted to explore any nagging concerns, or even serious doubts, there might be about the propriety of the order.

It is, therefore, upon consideration

ORDERED:

That, in the absence of a showing by the Government, the Application be, and the same is hereby DENIED without prejudice.

DONE and ORDERED at Tampa, Florida, this 4th day of February, 1994.

### EXHIBIT B

No. 93–15–MISC–T–21

### *ORDER*

NIMMONS, District Judge.

The Government appeals from an Order of the Magistrate Judge's denial of an application for extension of an order entered pursuant to 18 U.S.C. § 3123 authorizing installation and use of a pen register and trap-and-trace device. The issue presented is whether the extensions authorized by § 3123(c) may not, as found by the Magistrate Judge, extend beyond a cumulative period of 60 days. On review, this Court concludes that a proper interpretation of the statute is that, so long as the statutory prerequisites are met for each extension, the cumulative period of all such extensions is not limited to 60 days.

Section 3123(c) reads as follows:

(c) **Time period and extensions.**—(1) an order issued under this section shall

ty. That cannot be said here in view of the Government's refusal to make a showing.

authorize the installation and use of a pen register or a trap and trace device for a period not to exceed sixty days.

(2) Extensions of such an order may be granted, but only upon an application for an order under section 3122 of this title and upon the judicial finding required by subsection (a) of this section. The period of extension shall be for a period not to exceed sixty days.

Obviously, the statute, by using the plural "extensions," permits multiple extensions. The only question is whether the phrase "for a period not to exceed sixty days" refers to *each* such extension or to the *cumulative period* of all such extensions. In this Court's view, the latter reading is a strained one not dictated by logic or reason.

A reasonable reading of the last sentence of subsection (c)(2), which uses the singular "extension," not the plural "extensions," is that it merely defines the maximum period of *each* extension. As long as the applicant makes the requisite showing in order for the Court to be able to make the finding required by § 3123(a), an extension may be allowed pursuant to § 3123(c)(2).

Even if the Court were to regard the statute as ambiguous, further analysis leads to the same interpretation as suggested above. Although the Magistrate Judge found the legislative history of this relatively recent statute not to be enlightening, this Court is of the view that the following Senate and House reports tend to bolster what this Court regards as the plain meaning of the statute.

The Senate Report provides, in pertinent part:

Under proposed subsection 3123(c), the time period of authorization of installation and use of a pen register or trap and trace device is 60 days, with possible *extensions of 60 days*. An extension may be granted upon application for a section 3122 order. The same judicial findings required by subsection 3123(a) are also required.

S.Rep. No. 99–541, 99th Cong., 2d Sess. 47, 1986 U.S.C.A.A.N. 3601 (emphasis added).

The House Report language is similar:

Subsection (c) provides that the time period of authorization of an installation

and use of a pen register is 60 days, with possible *extensions of 60 days*.

H.Rep. No. 99–647, 99th Cong., 2d Sess., 77 (emphasis added).

It is also instructive to compare the extension provisions of 18 U.S.C. § 2518 (Title III wire, oral and electronic communication intercepts) with the subject pen register extension provisions. The relevant language is very similar. Section 2518(5) provides, in pertinent part:

*Extensions of an order* [authorizing the interception of wire, oral or electronic communications] may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. *The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days.*

18 U.S.C. § 2518(5) (emphasis added). Just as § 3123(c)(2) provides that "[e]xtensions [plural] ... may be granted," § 2518 provides that "[e]xtensions [plural] ... may be granted." Similarly, the period of each extension is then defined in the last underlined sentence in both statutes, each of which discusses "[t]he period of extension" (singular).

Notwithstanding this very similar language, Title III places no arbitrary limit on the number of extensions which may be obtained. Senate Report 1097, 1968 U.S.Code & Admin.News 2112, 2192.

Indeed, it would result in an anomalous situation to place the temporal limiting construction on the pen register extension provision, as the subject appealed order does, while the Title III extension provision requires no such limitation. Pen registers and trap-and-trace procedures are far less intrusive, in terms of privacy rights, than the actual interception of communications authorized under Title III. In fact, the Supreme Court has held that installation and use of a pen register is not a search under the Fourth Amendment, there being no interception of communications. *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). Moreover, the Tenth Circuit, relying in part on *Smith*, observed:

Given the lack of any "legitimate expectation of privacy" at stake . . ., the extremely limited judicial review required by 18 U.S.C. § 3122 is intended merely to safeguard against purely random use of this device by ensuring compliance with the statutory requirements established by Congress.

For the foregoing reasons, the order of the Magistrate Judge is REVERSED, and this cause is REMANDED for further proceedings consistent with this Order.[1]

DONE AND ORDERED, at Tampa, Florida, this 17th day of November, 1993.

---

1. In ruling as he did in the appealed order, the Magistrate Judge understandably relied upon a May 6, 1991, order of U.S. District Judge Wm. Terrell Hodges, who affirmed the ruling of another Magistrate Judge construing § 3123(c) in the same restrictive manner as did the subject order on appeal. In his order of affirmance, Judge Hodges noted that "[t]he government argues simply that the plain meaning of the statute is that it authorizes an unlimited number of sixty day extensions. No authority is offered in support of this position." In the instant appeal, the Government has, in the Court's view, made a substantial and persuasive showing that the narrow statutory construction embraced by the appealed order is erroneous.