UNITED STATES of America, Appellee,

v.

Ronnell D. SMITH, Appellant.

No. 93–3857.

United States Court of Appeals,
Eighth Circuit.

Submitted April 15, 1994.

Decided Aug. 18, 1994.

Rehearing Denied Oct. 17, 1994.

---

Susan M. Hunt, Kansas City, MO, for appellant.

William L. Meiners, Kansas City, MO, for appellee.

Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.

BOWMAN, Circuit Judge.

Ronnell D. Smith was convicted of conspiracy to possess with intent to distribute crack cocaine and of aiding and abetting the distribution of crack cocaine. The District Court[1]

[1]. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

sentenced him to two 120–month concurrent prison terms to be followed by five years of supervised release. He appeals and we affirm.

### I.

■ Smith first challenges the sufficiency of the evidence on both counts. We consider the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from that evidence. *United States v. Duncan,* 29 F.3d 448, 449–50 (8th Cir.1994).

On June 17, 1992, Smith drove to Farmon Williams's home in Kansas City, Missouri, arriving just after Williams himself. Already present to see both Williams and Smith arrive at the residence were Kansas City police detective Alesia Prince, working undercover, and informant David Stewart, who had arranged for Prince to meet Williams for the purpose of buying drugs. Williams asked Smith if he would take Williams, using Smith's car, to get some "D," street slang for dope or drugs, to sell to Prince, who, according to Williams, had $2400 with her. Trial Transcript at 184–86, 226, 239–40.

The group then left Williams's residence, Smith driving his car with Williams in the passenger seat, and Prince following in the undercover car with Stewart as a passenger. As Smith and Williams drove around the city that day, attempting to make contact with the crack cocaine source, Williams took a handgun from his waistband and placed it on the seat between him and Smith. At the first stop, near a park, Williams told Prince to pull over. Smith and Williams then drove off looking for the drug source, returning a minute or two later to where Prince was parked. Upon his return, Williams reported within earshot of Smith that the person they were looking for was not where he was supposed to be. *Id.* at 83, 190. Williams said he would page the source, and Smith and Williams drove off with Prince and Stewart following. At another location, Williams

placed a call from a pay phone, and then answered the phone when it rang back a few minutes later. Standing between Smith's car and the undercover car, he reported to Prince that the source was getting his hair cut so it would be about an hour. *Id.* at 97, 198. The four returned to Williams's home and waited until Williams received a page, left to make a phone call, and then returned and said, "[L]et's go." *Id.* at 103, 205. During the wait at the house, Williams took a handgun from his waistband and displayed it to his guests.

The group left Williams's house, Smith and Williams again in Smith's car, Prince and Stewart in the undercover car, and drove to a residence where the drug supplier was located. During that drive Smith and Williams discussed Prince, and Williams indicated he "thought she was a cop" and he did not trust her. *Id.* at 206. Upon reaching the residence, Williams took the cash from Prince and then met with the source, Charles "John John" Johnson, to complete the transaction. Johnson took the money and Williams retrieved the crack cocaine from a car parked in the driveway of the residence and handed it over to Prince.[2]

Smith left the residence, with Williams still his passenger, and with Prince and Stewart still following. At this point Williams believed they were being followed by unmarked police cars other than Prince's (as they were), and Smith and Williams began looking around for such vehicles. When they decided they in fact were being followed, Smith began taking what police witnesses described at the trial as "counter-surveillance" measures. Smith would slowly approach an intersection showing a green light, and as the light turned yellow and then red, he accelerated through the light then checked to see if anyone had followed. He would make turns slowly or very quickly and at the last possible moment, with both Smith and Williams looking back for cars that were following. Smith also took an entrance ramp onto interstate highway I–70 at a speed of sixty-five to seventy miles per hour. Shortly after that, the officers involved terminated the surveillance for safety reasons.

Smith drove Williams to a bank where Williams changed into smaller denominations the $100 bill he had received for arranging the drug transaction. Both cars returned to Williams's residence and Williams "holler[ed]" at Prince about what he had suspected to be police surveillance. *Id.* at 219. Stewart then left Prince's car, and Smith drove off with Williams and Stewart.

We conclude that, from these facts and the inferences to be drawn therefrom, a reasonable jury could find Smith guilty beyond a reasonable doubt of conspiracy to distribute crack cocaine. *See United States v. Jones,* 990 F.2d 1047, 1048 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 699, 126 L.Ed.2d 666 (1994).

To prove Smith's participation in this conspiracy, it was incumbent upon the government to present evidence that Smith entered into an agreement with one or more other persons to violate the law. *United States v. Brown,* 956 F.2d 782, 785 (8th Cir.1992). Smith contends that there was no such agreement, and that his presence at the transaction and his association with a coconspirator do not establish his knowing agreement to join the conspiracy.

The government, however, was not required to offer proof of a formal agreement, but was permitted to show "a tacit understanding proven wholly by circumstantial evidence or by inferences" drawn from Smith's actions. *United States v. Searing,* 984 F.2d 960, 964 (8th Cir.1993). With the conspiracy between Johnson and Williams established, as it clearly was, only minimal evidence was required to connect Smith with it. *United States v. Hoelscher,* 914 F.2d 1527, 1534 (8th Cir.1990), *cert. denied,* 498 U.S. 1090, 111 S.Ct. 971, 112 L.Ed.2d 1057 *and* 500 U.S. 943, 111 S.Ct. 2240, 114 L.Ed.2d 482 (1991). Although on review we must view the evidence in the light most favorable to the verdict, Smith would have us judge the credibility of witnesses, especially Williams, and resolve contradictions in the testimony in favor of Smith, even though it would not strain a reasonable juror to believe the gov-

---

**2.** Williams and Johnson both pleaded guilty to charges arising out of the drug transaction.

ernment witnesses' testimony. Taking the course of action Smith suggests would require that we invade the province of the jury and we decline to do so. *See United States v. Jackson*, 959 F.2d 81, 82–83 (8th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992).

There was ample evidence of Smith's knowing participation in the conspiracy. First, he agreed to drive Williams all over parts of Kansas City knowing that their mission was to purchase illegal drugs for Prince. Smith assisted Williams in scanning the streets and a park on their initial foray, looking for the drug source. He drove Williams to the supplier's location when Williams finally located him. Also relevant is the fact that Williams carried a gun and displayed the weapon repeatedly in Smith's presence, given the understanding "that weapons are a 'tool of the trade' for narcotics dealers." *United States v. Westbrook*, 896 F.2d 330, 335 (8th Cir.1990) (citation to quoted case omitted).

Smith argues that we should not consider the evasive actions that Smith, as driver, took when he and Williams believed they were being followed by the police. He denies that the counter-surveillance activities we have recited took place, but also contends that, if they did, they occurred after the conspiracy was over and cannot be considered evidence of Smith's participation in the conspiracy. We disagree.

This is not a case where efforts were made days or weeks later to conceal a crime that otherwise took place all in one day. Smith took the evasive measures as he and Smith were leaving the scene of the crime, in the belief that they were being followed from that crime scene by the police and suspecting that the drug buyer who also was following might be an undercover officer. Likewise, Smith's stop at a bank so that Williams could break the $100 bill he received as payment for arranging the illegal transaction was made soon after the counter-surveillance measures proved successful, and itself was an immediate action taken to conceal partic-

ipation in the drug deal. This is not a case where circumstantial evidence showed that the coconspirators were acting at a later time to keep the drug transaction secret, that is, that they were involved in a separate conspiracy to conceal the crime. Instead Smith and Williams were affirmatively attempting to conceal evidence of the drug conspiracy, as a continuing aspect of that drug conspiracy. Smith and Williams "intended from the first to exert strenuous efforts to prevent discovery of the crime and of their involvement in it." *United States v. Masters*, 924 F.2d 1362, 1368 (7th Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 *and* — U.S. —, 112 S.Ct. 86, 116 L.Ed.2d 58 (1991). We hold that these efforts, taken contemporaneously with the drug transaction itself, were a part of the original conspiracy and may properly be considered in assessing the sufficiency of the evidence.

We conclude that the evidence of Smith's affirmative acts showed more than "association or acquaintance" with the drug transaction and the drug dealers. *United States v. Rogers*, 982 F.2d 1241, 1244 (8th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 3017, 125 L.Ed.2d 706 (1993). "[H]e knowingly contribute[d] his efforts to the conspiracy's objectives." *United States v. Duckworth*, 945 F.2d 1052, 1053 (8th Cir.1991).

■ The same evidence that supports Smith's conviction for conspiracy also was sufficient to sustain the conviction for aiding and abetting the distribution of crack cocaine. *See United States v. Hernandez*, 986 F.2d 234, 239 (8th Cir.1993). Aiding and abetting may be proved without a showing that Smith possessed or sold crack cocaine. *See id.* at 238. Clearly, by providing transportation and then evading the police, Smith "associated himself with the distribution venture" and by his "affirmative participation in the transaction encouraged his coconspirators." *Id.*

We hold that the evidence was sufficient to convict Smith of both conspiracy to distribute crack cocaine and aiding and abetting the distribution of crack cocaine.

## II.

■ Smith next claims the District Court abused its discretion in allowing cross-examination of Smith's character witnesses about their knowledge of Smith's prior arrest for possession of marijuana. We disagree.

Before trial, Smith filed a motion in limine to exclude evidence of, and inquiry about, his previous arrest. The court overruled the motion "because it will depend on how the testimony comes in on the character witnesses," and suggested that Smith's counsel raise his objection at the appropriate point in the trial. Trial Transcript at 30. At the trial, as a part of his defense, Smith called six character witnesses. The first, Marlene Stewart, Smith's mother, when asked on direct examination if she knew about Smith's reputation for honesty or truthfulness, testified, "The reputation in the community is that Ronnell do not deal nor smoke any kind of drugs, crack cocaine." Trial Transcript at 248. The government asked for a bench conference and explained that it planned to go forward with questions concerning Stewart's knowledge of the marijuana arrest, since Stewart had opened the door with her testimony on direct. Smith's counsel objected but the court allowed it.

Clearly this was proper cross-examination, given Stewart's testimony that Smith was not involved in drugs. See *Michelson v. United States*, 335 U.S. 469, 482–83, 69 S.Ct. 213, 221–22, 93 L.Ed. 168 (1948). Of the five remaining character witnesses, however, none made any mention of drugs or drug dealing when testifying about Smith's character on direct examination. The government nevertheless attempted to ask all five if they knew about Smith's arrest for possession of marijuana.[3] The government's question explained that Smith was a passenger in a car when officers observed Smith attempting to hide something under the car seat just before the car was stopped and searched, marijuana was discovered under the seat, and Smith

was arrested. See, e.g., Trial Transcript at 261, 273, 285, 289. Even though none of the character witnesses after Stewart testified on direct examination about drugs, Smith's counsel did not object to the government's inquiry of these witnesses, except as to the form of the question when it omitted reference to the arrest. Because counsel failed to renew his objection, we will review only for plain error. That is, we cannot consider Smith's argument unless the District Court, by allowing the cross-examination, committed an error, clear under existing law, that adversely impacts Smith's substantial rights. *United States v. Montanye*, 996 F.2d 190, 192 (8th Cir.1993) (en banc). For various reasons, we conclude there was no plain error here.

We begin with the proposition that the relationship between knowledge of a previous drug arrest and knowledge of an individual's reputation for truth and honesty is tenuous at best. See *Westbrook*, 896 F.2d at 335. Here, however, the matter already was properly before the jury on the cross-examination of Marlene Stewart, as her testimony on direct examination opened the door. Moreover, the first substantive question posed to Smith on his direct examination concerned the marijuana arrest, which Smith acknowledged. (He also testified that the charge was dismissed.) In addition, the court instructed the jury that the government's questions on cross-examination of the character witnesses, and the responses, were to be used only to assess the character witnesses' knowledge of Smith's reputation. In these circumstances, the District Court did not commit plain error in allowing the government's cross-examination on Smith's marijuana arrest.

## III.

■ For his final issue on appeal, Smith argues that the District Court erred in refusing to grant him a new trial on the grounds

---

3. The District Court refused to permit the government to ask one of the witnesses about the marijuana arrest because that witness was unable to answer the character question put to him on direct examination.

of newly discovered evidence. After he filed his notice of appeal, Smith filed a motion for a new trial in the District Court, and a motion to stay the appeal in this Court, both based on newly discovered evidence. This Court remanded for a ruling on the motion in the District Court; the court denied the motion. We review that decision for clear abuse of discretion. *United States v. Turk*, 21 F.3d 309, 312 (8th Cir.1994).

Smith's alleged newly discovered evidence was presented in two affidavits, one from fellow federal inmate Bobby Lee Bridges [4] and the other from corrections officer William Bais.[5] Bridges's affidavit states that Williams told him that Williams did not know why Smith was charged in the case because Smith had nothing to do with it, and that Williams would so testify. Bais's statement was that Williams told him after Smith was sentenced that Williams had told "everybody" that Smith was not involved, but he guessed the court did not believe him and he did not understand why.

■ A district court abuses its discretion by refusing to grant a motion for a new trial based on newly discovered evidence only if it is clear that the evidence is in fact newly discovered and that due diligence was exercised in discovering it; and that the evidence is relevant to a material issue, not cumulative or impeaching, and "probably would produce an acquittal on retrial." *United States v. Johnson*, 12 F.3d 827, 833 (8th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 1860, 128 L.Ed.2d 482 (1994).

It is clear that this purported evidence is not newly discovered. Williams testified on cross-examination at the trial that he had said shortly before the trial that Smith had not been involved in the conspiracy. Trial Transcript at 231. Thus the evidence was not newly discovered if counsel was aware at the time of the trial that Williams had been making statements similar to those alleged in the affidavits. Counsel obviously heard from someone that Williams was making such statements and could have sought out those who had heard the statements (although perhaps not Bridges and Bais) and subpoenaed them to testify at Smith's trial. Moreover, not only had the evidence already been "discovered," but also the substance of it had been presented to the jury for its consideration.

As for the value of the evidence itself in producing an acquittal, the likelihood of that is far too remote even to approach "probable." This was not a recantation by Williams himself; there is no indication that Williams's testimony as to Smith's involvement in the conspiracy has changed. Parts of the information Williams allegedly gave Bais were not even true—Williams had not told the court that Smith was not involved (and so the court was not in a position to disbelieve him). We conclude that the District Court did not abuse its discretion in determining that Williams's alleged statements reported by others would not produce an acquittal on retrial, especially considering Williams's detailed testimony to the contrary given under oath at trial.

Smith's convictions are affirmed.

---

**4.** The text of the affidavit spells the first name "Bobbie," but the first name in the typed signature line, the signature, and the notary's statement is spelled "Bobby."

**5.** The text of the statement identifies "Bill Bias" and "Will Bias" as the affiant, and the typed signature line reads "Will Bias." Both briefs refer to the affiant as "Bias." Someone, however, apparently Bais, changed the last name in the text of the affidavit to "Bais" and corrected the signature line to read "William Bais." The signature is not legible.