**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Adonna R. FREGOSO, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David A. FREGOSO, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gregoria SORIA, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Fred H. BROWN, Defendant–Appellant.**

Nos. 94–2959, 94–3035, 94–3039 and 94–3041.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 9, 1995.

Decided July 27, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 94–3041 Oct. 10, 1995.

Judy K. Hoffman, Omaha, NE, argued, for appellant in 94–2959.

C. Gregg Larson, St. Joseph, MO, argued, for appellant in 94–3035.

Martin J. Kusher, Omaha, NE, argued, for appellant in 94–3039.

James M. Davis, Omaha, NE, argued, for appellant in 94–3041.

William W. Mickle, Asst. U.S. Atty., argued for appellee.

Before HANSEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WILL,* Senior District Judge.

---

* The HONORABLE HUBERT L. WILL, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

HANSEN, Circuit Judge.

Adonna R. Fregoso, David A. Fregoso, Gregoria Soria, and Fred H. Brown appeal from the final judgments entered by the district court[1] after they were found guilty on two drug counts. They make various challenges to their convictions, and Brown challenges his sentence. We affirm.

## I.

In early 1992, narcotics officers of the Omaha, Nebraska, Police Department acquired information which gave them cause to believe that Dixie Buck was distributing drugs from her residence. Officers obtained authority from the Douglas County, Nebraska, district court to install pen registers for 60 days on the telephone lines of Buck and Peter Lopez, whom they also believed to be distributing cocaine. The state court also authorized the telephone company to supply subscriber information and caller identification service for the phones to which the pen registers were attached. Subsequently, officers also requested and received state court authorization to intercept conversations over Buck's and Lopez's home telephones.

Based upon information acquired from the pen registers, wiretaps, and other investigative methods, officers obtained search warrants for the residences of Buck, the Fregosos, Soria, and Brown. As the officers commenced execution of the search warrant at the Fregosos' residence, they observed David Fregoso, who was standing outside the residence, drop a towel and plastic baggie from his hand. The contents of the plastic baggie were later determined to be over one-half of an ounce of cocaine. Additionally, pursuant to the search, three one-eighth-ounce quantities of cocaine in plastic baggies were seized from Soria's residence.

An indictment later charged eleven defendants, including the Fregosos, Soria, and Brown, with conspiracy to distribute and possess with intent to distribute cocaine (Count I) and with possession of cocaine in furtherance of the conspiracy (Count II, a *Pinkerton v. United States*, 328 U.S. 640, 648–49, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946), theory of criminal liability), based upon the quantity of cocaine David Fregoso dropped on the day the search warrants were executed. After the district court denied various pretrial motions filed by the defendants, the case proceeded to trial against four defendants, i.e., the Fregosos, Soria, and Brown. The jury convicted all four defendants on both counts of the indictment. The district court sentenced each defendant to a term of imprisonment at the bottom of that defendant's identified Guidelines range, with the sentences for the two counts to run concurrently.[2] The defendants appeal.

## II.

### A.

The Fregosos contend that the district court erred by denying their motion to suppress evidence obtained in connection with the state court order authorizing the use of pen registers.[3] In addition to authorizing the use of pen registers, the state court order also authorized the use of "caller identification service"[4] on the same telephone and

1. The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

2. Adonna Fregoso was sentenced to 63 months (Level 25, Criminal History Category II = 63 to 78 months); David Fregoso to 63 months (Level 26, Criminal History Category I = 63 to 78 months); Soria to 21 months (Level 16, Criminal History Category I = 21 to 27 months); and Brown to 15 months (Level 14, Criminal History Category I = 15 to 21 months).

3. "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *United States v. New York Tel. Co.*, 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 367 n. 1, 54 L.Ed.2d 376 (1977). "The installation and use of a pen register ... [is] not a 'search' " within the meaning of the Fourth Amendment and therefore its use does not violate the Constitution. *Smith v. Maryland*, 442 U.S. 735, 745–46, 99 S.Ct. 2577, 2583, 61 L.Ed.2d 220 (1979).

4. As the magistrate judge observed, the caller identification (at least as it was used in this case) is a device placed on a telephone which has the ability to decode the electronic impulses caused when the phone receives a call in order to identify the number from which the incoming call originates. (R. at 213–14.)

permitted the phone company to supply subscriber information for the telephone numbers obtained from the pen register and the caller identification service. The Fregosos claim that authorizing the use of caller identification service and permitting the phone company to provide subscriber information violated federal and Nebraska law and argue that evidence obtained through these means must be suppressed.[5] The magistrate judge[6] determined that these practices did not violate state or federal law and the district court adopted this conclusion. "We review the district court's disposition of the motion to suppress under a clearly erroneous standard." *United States v. Olderbak*, 961 F.2d 756, 760 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 422, 121 L.Ed.2d 344 (1992).

■ Initially, we reject the Fregosos' argument to the extent that they contend that these investigative means violated Nebraska law. We have consistently held that evidence obtained without violating the Constitution or federal law is admissible in a federal criminal trial even if the evidence is obtained in violation of state law. *See Olderbak*, 961 F.2d at 760; *United States v. Neville*, 516 F.2d 1302, 1309 (8th Cir.), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 251 (1975). In *Olderbak*, we held that the results of the pen register were admissible under federal law and accordingly declined to decide whether it violated state law. *Id.* The Fregosos' attempts to distinguish this caselaw are unpersuasive.[7]

■ Further, the use of these means was not a violation of federal law. We believe that the caller identification service is a "trap and trace device" as that term is defined in 18 U.S.C. § 3127(4). A trap and trace device is "a device which captures the incoming

electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C. § 3127(4). As the magistrate judge observed, the caller identification service at issue in this case is a device which "decode[s] the electronic impulses the telephone is receiving and display[s] them as a telephone number at the same time that the telephone is receiving the ringing impulses." (R. at 213–14.) We believe that the caller identification service in this case clearly falls within the definition of a trap and trace device under § 3127(4).

■ The judicial role in approving use of trap and trace devices is ministerial in nature because, upon a proper application being made under 18 U.S.C. § 3122, "the court *shall* enter an ex parte order authorizing the installation" of such a device. 18 U.S.C. § 3123(a) (emphasis added); *see also United States v. Hallmark*, 911 F.2d 399, 402 (10th Cir.1990) (outlining limited judicial role in approving pen registers and trap and trace devices); *In re Order Authorizing Installation of Pen Reg.*, 846 F.Supp. 1555, 1558–59 (M.D.Fla.1994) (court's role with respect to trap and trace devices limited to confirming: (1) identity of applicant and investigating law enforcement agency, and (2) certification from applicant that information sought relevant to ongoing investigation). Furthermore, the statutory scheme (which is the same for trap and trace devices as for pen registers) does not mandate exclusion of evidence for violations of the statutory requirements. *See United States v. Thompson*, 936 F.2d 1249, 1249–50 (11th Cir.1991) (information obtained from a pen register need not be suppressed despite noncompliance with statutory requirements because governing stat-

---

**5.** We assume without deciding that the Fregosos have standing to challenge the use of these investigative means. As noted above, the pen register orders applied to Dixie Buck's and Peter Lopez's telephones.

**6.** The Honorable Kathleen A. Jaudzemis, United States Magistrate Judge for the District of Nebraska.

**7.** We decline the Fregosos' invitation to overrule *Olderbak* (something this panel could not do even

if it were so inclined) by holding that evidence obtained in violation of a state statute is inadmissible in a federal criminal prosecution. We also decline to adopt the Fregosos' related argument that the federal statutes are merely a floor which permits states to impose more rigorous requirements for obtaining evidence which should be enforced by a federal court, first because they offer no authority for this proposition, and second because it would eviscerate the *Olderbak* holding.

utes, 18 U.S.C. §§ 3121–3127, do not require exclusion for violations), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992).

The Fregosos do not point to any evidence that the proper procedures were not followed under 18 U.S.C. §§ 3121–3127 for obtaining a trap and trace device (the caller identification service). Rather, they contend that the authorization for caller identification service is the equivalent of a wiretap, for which more stringent requirements are imposed under 18 U.S.C. §§ 2510–2522 (Title III). We disagree. Title III makes it clear that devices which satisfy the statutory definition of pen registers or trap and trace devices set forth in 18 U.S.C. § 3127 are exempted from its requirements. *See* 18 U.S.C. § 2511(2)(h) ("[i]t shall not be unlawful under [Title III]— (i) to use a pen register or a trap and trace device" as those terms are defined in 18 U.S.C. § 3127); *Brown v. Waddell,* 50 F.3d 285, 290 (4th Cir.1995) (trap and trace devices exempted from requirements of 18 U.S.C. §§ 2510–2521). Having concluded that the caller identification service falls within the definition of a trap and trace device, the Fregosos' argument that the caller identification service was a wiretap subject to the requirements of Title III must fail.

■ We likewise reject the Fregosos' contention that because the applicable state and federal statutes do not by their specific terms authorize law enforcement officers to obtain caller identification service, evidence obtained by this device must be suppressed. As noted above, the caller identification service was a lawful trap and trace device. In any event, we are not persuaded to hold that every device used in a criminal investigation which is not specifically authorized by statute is prohibited and accordingly evidence obtained through its use must be suppressed.

■ With respect to the subscriber information, this information does not satisfy the definition of a pen register, trap and trace device, or a wiretap under the above

statutes. The information was not obtained by a device attached to a telephone or through the use of any electronic, wire, or mechanical device and was not a type of oral communication. We agree with the magistrate judge's assessment that because this information is listed in phone books and city directories, and at a bare minimum revealed to the phone company to obtain telephone service, there can be no expectation that this information will remain private. *See Smith v. Maryland,* 442 U.S. 735, 743–44, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties"). Therefore, acquisition and use of the subscriber information did not violate federal law.

■ Finally, we reject the Fregosos' argument that the use of the caller identification service and the subscriber information, when combined with the pen register, cumulatively is the equivalent to a wiretap because each of these measures was lawful. The district court committed no error in declining to suppress evidence obtained in association with the pen register.

### B.

■ The Fregosos and Soria argue that the district court erred in refusing to suppress evidence obtained from the wiretaps placed on the telephones of Dixie Buck and Peter Lopez. Again, our review is for clear error. *Olderbak,* 961 F.2d at 760.

■ The Fregosos raise a myriad of arguments why the results of the wiretap should have been suppressed. However, the only argument that they presented to the district court was that law enforcement officers failed to minimize the interception of calls which were not subject to interception on both of the Buck and Lopez phones.[8]

■ The Fregosos specifically argue that the monitoring officers failed to discover that

---

**8.** On the other hand, Soria does not renew the many arguments he made prior to trial concerning why suppression of the wiretap information was required but merely argues that the evidence obtained from the wiretap should not have been

admitted at trial against him because it was hearsay, irrelevant, and unduly prejudicial. He has thus abandoned the arguments that he failed to renew on appeal, and we reject his remaining arguments as meritless.

a large number of the allegedly incriminating telephone calls between various co-conspirators occurred at certain times of the day and because of that pattern, the officers should have monitored calls only during that period of time.[9] 18 U.S.C. § 2518(5) requires that electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." Whether minimization has taken place depends upon "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). Although the governing statute, 18 U.S.C. § 2518(5), places no limitations on the time of day that interception of phone calls may take place, one court has held that "[o]nce a pattern of innocent calls develops, of course, those monitoring have a duty to terminate their recording of such calls." *United States v. Abascal,* 564 F.2d 821, 827 (9th Cir.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978). However, we have been more tolerant of extensive surveillance involving the use of wiretaps in large scale narcotics conspiracy cases involving frequent drug related conversations. *United States v. O'Connell,* 841 F.2d 1408, 1417 (8th Cir.1988), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1989).

■ In this case, the magistrate judge found, with respect to the Lopez wiretap, that a pattern of drug related calls at certain times of the day became apparent only through judicial hindsight. The magistrate judge also noted that the wiretap orders authorized monitoring calls 24 hours a day, 7 days a week. The magistrate judge's findings are amply supported by the record and satisfy the requirements of 18 U.S.C. § 2518(5). Additionally, the state court judge maintained regular oversight of the wiretaps during their existence, with interim reports being filed with the judge every 12–16 days for both wiretaps. We agree with the magistrate judge that the officers' actions in failing to monitor calls only during certain periods of the day were objectively reasonable within the meaning of *Scott.*

■ We decline to address the Fregosos' remaining arguments which are raised for the first time on appeal, *see Thomas v. United States,* 27 F.3d 321, 324 (8th Cir.1994), and in any event conclude that they are meritless. Therefore, the district court's denial of Fregosos' and Soria's motions to suppress evidence obtained from the wiretap was not clearly erroneous.

C.

■ Brown and Soria both challenge the sufficiency of the evidence to sustain their convictions. In evaluating these claims, "[w]e consider the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from the evidence." *United States v. Smith,* 32 F.3d 1291, 1292 (8th Cir.1994). "We reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." *United States v. Ivey,* 915 F.2d 380, 383 (8th Cir.1990) (citation omitted). Brown also argues that the district court erred in failing to grant him a new trial. "In reviewing the denial of a motion for a new trial, we consider whether the district court abused its discretion in determining that the verdict was not against the weight of the evidence." *United States v. Bordeaux,* 980 F.2d 534, 535 (8th Cir.1992).

Brown and Soria were convicted of conspiracy to distribute and possession with intent to distribute cocaine (Count I) and the *Pinkerton* count involving possession with intent to distribute cocaine by co-conspirator David Fregoso (Count II). Neither Brown nor Soria argues that a conspiracy did not exist; rather they both contend that the evidence failed to connect them to the conspiracy. In order to put these claims in context, we briefly recount the evidence adduced at trial.

**9.** It is not clear whether Adonna Fregoso made this argument in the district court and whether she joins David Fregoso in making this argument here because the Fregosos have filed a joint brief.

In any event our decision with respect to both Fregosos would be the same, and we address this issue with respect to both of them.

Dixie Buck testified for the prosecution that she began distributing cocaine in approximately February 1992, after she became unemployed. After using several different cocaine suppliers, she settled upon the Fregosos because they could provide her with the quantities she needed. Buck then distributed this cocaine to her customers, among them Fred Brown. Buck testified that she acquired one to two half-ounce quantities of cocaine per week from the Fregosos from April 1992 to December 1992. Buck also obtained quantities of cocaine from Soria on four separate occasions.

■■■■■ To prove that Brown and Soria participated in the charged conspiracy, the government was required to present evidence that they "entered into an agreement with one or more other persons to violate the law." *Smith*, 32 F.3d at 1293. This agreement need not be formalized but can be shown through " 'a tacit understanding proven wholly by circumstantial evidence or by inferences' " drawn from Brown's and Soria's actions. *Id.* (quoting *United States v. Searing*, 984 F.2d 960, 964 (8th Cir.1993)). The government cannot rely on Brown's and Soria's mere knowledge of the existence of a conspiracy; rather, "it must establish some degree of knowing involvement and cooperation." *United States v. Casas*, 999 F.2d 1225, 1229 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 894, 127 L.Ed.2d 86 (1994). With the conspiracy to distribute cocaine between the Fregosos and Buck established, as it clearly was, the government only needed to offer slight additional evidence to link Brown and Soria to it. *United States v. Logan*, 49 F.3d 352, 360 (8th Cir.1995).

■■■ Soria argues that insufficient evidence was presented connecting him with the conspiracy. We disagree. When law enforcement officers executed a search warrant at Soria's residence, they discovered three plastic baggies containing a white powdery substance. The contents of the plastic bags were analyzed and each contained one-eighth of an ounce of cocaine. The prosecution presented expert testimony that this was a quantity suitable for distribution.

■■ Further, Dixie Buck testified that she bought half-ounce quantities of cocaine from Soria on four different occasions. On the last three occasions, Soria "fronted" her the cocaine in order to facilitate her resale of it. Finally, Buck testified that it was her understanding that Soria did not want the Fregosos to know that he was an alternative source of cocaine for her. Although Soria challenges Buck's credibility, we must resolve issues of credibility in favor of the verdict, and we decline to invade the province of the jury as Soria would have us do. *Smith*, 32 F.3d at 1293–94. Bearing in mind that the government needed only to offer slight evidence to link Soria to the established conspiracy, this evidence was sufficient for a reasonable juror to conclude beyond a reasonable doubt that Soria entered into an informal agreement with Buck to violate the law, i.e., provide her with cocaine for further distribution.

Finally, Soria argues that the evidence against him establishes nothing more than a buyer-seller relationship between him and Buck, which is insufficient to sustain his convictions according to *United States v. West*, 15 F.3d 119, 121 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 177, 130 L.Ed.2d 112 (1994) ("mere sales agreement with respect to contraband does not constitute a conspiracy; there must be some understanding 'beyond' that"). In *West*, we reversed a conviction for conspiracy to distribute cocaine where the defendant sold drugs to two individuals for their own personal consumption and the purchasers did not know, or know of, each other. *Id.* We have acknowledged however that where there is "independent evidence tending to prove that the defendant had some knowledge of the scope of the conspiracy," this evidence, along with the buyer-seller relationship, may be sufficient to support a conspiracy conviction. *United States v. Prieskorn*, 658 F.2d 631, 635 (8th Cir.1981) (quotations and citations omitted).

■■ Here, viewing the evidence in the light most favorable to the verdict, there was independent evidence that Soria was aware that the quantities he sold would be used for distribution. Soria "fronted" the cocaine to Buck and was aware that he was an alterna-

tive source of cocaine for Buck's cocaine enterprise. Soria's relationship with Buck was more than a seller-buyer arrangement, and a reasonable juror could find Soria's guilt of the offenses beyond a reasonable doubt.[10]

The evidence with respect to Brown is somewhat more problematic. Brown was an attorney who was so addicted to cocaine that he was frequently injecting it. Buck testified that Brown bought cocaine from her approximately 200 times. Brown admits that he acquired cocaine from Buck on numerous occasions but argues that his purchases were solely for personal consumption and thus he and Buck had nothing more than a buyer-seller relationship. He points out that both he and Buck testified that there was never any agreement between them to distribute cocaine. He also argues that he did not take any additional acts to tie him to the conspiracy in that there was no evidence that he had a financial stake in Buck's enterprise or that he assisted her with the distribution in any manner.

Although we agree with Brown that his relationship with Buck was first that of buyer-seller, there was evidence that Brown played an additional role by assisting Buck in facilitating her cocaine enterprise such that a reasonable juror could convict him of conspiracy to distribute cocaine. First, Buck testified that on one occasion she ran out of cocaine because the Fregosos were unable to supply her. She called Brown and informed him of her situation, and Brown told her to go to a local bar and he would meet her there and possibly be able to help her. She subsequently met Brown and Steve Cymbalista at the bar. Brown and Cymbalista set up a "buy" for her with one of the bar's patrons. Buck gave Brown $250, Brown in turn gave the money to Cymbalista, who went to the men's room in the bar, bought the one-eighth

of an ounce of cocaine from the patron, and delivered it to Buck. *See United States v. Scott,* 26 F.3d 1458, 1462–63 (8th Cir.) (affirming drug conspiracy conviction in part because defendant put co-defendant in touch with drug source), *cert. denied,* —— U.S. ——, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994).

Further, on several occasions Brown acted as an informal "debt collector" for Buck by persuading Cymbalista and Mary Cox to pay sums they owed Buck for cocaine. For instance, Buck testified that she sometimes "fronted" cocaine to Cymbalista. When Cymbalista would not pay her for the quantities, she testified that she called Brown, who persuaded Cymbalista to pay her. Buck interpreted an intercepted telephone conversation in which she asked Brown to tell Cymbalista that she needed to talk to him. According to Buck, this was one occasion that she used Brown to persuade Cymbalista to pay her. *See United States v. Nunn,* 940 F.2d 1128, 1132 (8th Cir.1991) (evidence sufficient to support conspiracy conviction where defendant made calls to collect money from prior drug sales made by other co-conspirators). *Cf. United States v. Zerba,* 21 F.3d 250, 252 (8th Cir.1994) (evidence sufficient to support drug conspiracy conviction relying in part that defendant acted as drug debt collector for another).

Brown frequently drove Cox and Cymbalista to Buck's house where they would purchase cocaine, albeit for their own personal use. *Cf. Nunn,* 940 F.2d at 1132 (affirming conviction where defendant drove others to various places for drug transactions). Brown was present at Buck's house when various drug transactions and drug use were taking place, frequently joining the activities himself, and he clearly knew the nature of business that was taking place there. Moreover, Buck testified that Brown was aware that

**10.** Soria devotes a sizeable portion of his brief to arguing that the prosecution failed to make a prima facie showing that he was a member of the conspiracy and therefore the district court erred in admitting a substantial number of out-of-court statements which he argues bore no relationship to him and therefore were hearsay, irrelevant, and prejudicial. The district court, pursuant to our decision in *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978), conditionally admitted the statements against Soria as statements by a

co-conspirator under Federal Rule of Evidence 801(d)(2)(E), subject to a later determination of whether the government had proved by a preponderance of the evidence the existence of a conspiracy, Soria's participation in it, and that the statements were made in furtherance of the conspiracy. The district court determined that the evidence satisfied this test. After carefully reviewing the record, we find no error with respect to the court's procedure or its finding, and therefore we affirm with respect to this issue.

she was getting some of her cocaine from the Fregosos. *See Prieskorn,* 658 F.2d at 635 (affirming conspiracy conviction where defendant had knowledge of the scope of conspiracy and made a cocaine purchase from a conspirator).

Evidence was also presented that Brown used Cox or Cymbalista to pick up cocaine from Buck and bring it back to him where they would share the drugs. Brown instructed Cox to carry the cocaine in her mouth and swallow it if she was stopped by the police. Brown also acquired cocaine from Buck by himself and shared it with Cox and Cymbalista. Cox witnessed Cymbalista purchase cocaine from Brown on numerous occasions. She testified that the transactions would take place at her apartment, Cymbalista's home and, on occasion, Brown's residence. Cox stated that Brown would divide the quantity of cocaine into either quarter or half gram quantities for which she witnessed Cymbalista pay Brown $25 or $50. Further evidence we deem significant is that Brown (who was representing Buck on her claim) personally delivered Buck's monthly worker's compensation checks to her without charging or deducting any attorney's fee (thus indirectly financing her drug distribution business) and, when Buck was arrested in Missouri on an unrelated drug charge, Brown provided the bail money.

 As we have noted, once the evidence showed the existence of a conspiracy, only slight or minimal evidence was necessary to connect Brown to it. *See Smith,* 32 F.3d at 1293. The above evidence shows that Brown was no passive purchaser, but instead played a larger role than merely buying drugs from Buck for his own personal consumption. We believe that the evidence was sufficient to establish that Brown knowingly entered into an informal tacit agreement with Buck to facilitate her cocaine enterprise which extended beyond his mere purchase of drugs for his own use.

 Brown repeatedly argues that his conviction cannot stand because there was no evidence that he bought cocaine for "resale." We emphatically disagree. The substantive criminal statute underlying the conspiracy count, 21 U.S.C. § 841(a)(1), makes it a crime to "distribute" controlled substances (among them cocaine) and makes no mention of "resale." No "sale" is required to violate the statute. Brown "distributed" cocaine within the meaning of the statute when he freely gave cocaine to Cox and Cymbalista on numerous occasions as well as when he sold to Cymbalista some of what he had purchased from Buck. Further, although purchasing cocaine for "resale" is certainly one type of conduct upon which a conviction for conspiracy to distribute cocaine may be obtained, *see United States v. Issaghoolian,* 42 F.3d 1175, 1178 (8th Cir.1994), it is not the sole basis upon which one can be convicted under the statute. We have upheld conspiracy convictions where the defendant played a role which furthers the purposes of the conspiracy, without purchasing drugs for "resale." *See Scott,* 26 F.3d at 1462–63 (affirming drug conspiracy conviction in part because defendant put co-defendant in touch with drug source); *Nunn,* 940 F.2d at 1132 (evidence sufficient to support conspiracy conviction where defendant made calls to collect money from prior drug sales made by other co-conspirators); *United States v. Kocher,* 948 F.2d 483, 485 (8th Cir.1991) (affirming conspiracy conviction where defendant leased barn to co-conspirator for amphetamine laboratory, defendant maintained utility bills on barn and maintained surveillance camera for barn, and himself used cocaine).

 Brown finally argues that the evidence did not demonstrate an agreement between him and Buck to distribute cocaine. However, no express agreement is required; rather the government need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of Brown's actions. *See Smith,* 32 F.3d at 1293. Further, "the jury, not the reviewing court, evaluates the credibility of the witnesses and weighs their testimony," in assessing whether an informal agreement existed. *Scott,* 26 F.3d at 1463 (quoting *Zerba,* 21 F.3d at 251–52).

The district court properly denied Brown's and Soria's motions for judgment of acquittal and Brown's motion for a new trial.

### D.

■ Soria claims that the district court erroneously permitted Buck to testify to her interpretation of several intercepted telephone conversations, including what she believed the other parties to the conversation meant by their statements. The district court instructed the jury that the testimony was being admitted only to show Buck's understanding of the meaning of the conversation and not Buck's opinion of what the other speakers actually meant. We review the district court's decision to admit challenged testimony for an abuse of discretion. *United States v. Hazelett*, 32 F.3d 1313, 1316 (8th Cir.1994).

■ In *United States v. Franklin*, 747 F.2d 497 (8th Cir.1984), we rejected an identical argument to that presented here. We stated that where "a witness is in a position to know what [the other party] meant, a district court does not abuse its discretion in admitting testimony as to her understanding of the meaning of the words used by [the other party]." *Id.* at 498 (quotations and citation omitted). For the same reason, we conclude that the district court did not abuse its discretion in allowing Buck to testify as to her interpretation of the telephone conversations.

### E.

Brown and David Fregoso argue that the district court erred by failing to give their requested jury instructions.

In reviewing the adequacy of the district court's jury instructions, three criteria are considered. First, the instruction must inform the jurors of the essential issues and the permissible ways to resolve them. Second, the defendant is entitled to an instruction reflecting the party's theory of the case if a timely request is made and the proffered instruction is supported by the evidence and correctly states the law. Finally, the district court has wide discretion in formulating appropriate jury instructions. A defendant is not entitled to an instruction that is particularly-worded so long as the instruction given by the court adequately and correctly cover[s] the substance of the requested instruction.

*United States v. Cabbell*, 35 F.3d 1255, 1259 (8th Cir.1994) (internal citations and quotations omitted).

■ As noted above, Brown's theory of the case was that he was simply a user of cocaine and he had no interest or involvement in Buck's conspiracy to distribute cocaine. Consistent with this theory, he proposed an instruction explaining that the existence of a buyer-seller relationship, standing alone, was insufficient to establish a conspiracy between Brown and Buck to distribute cocaine. The district court declined to give Brown's proposed instruction and instead gave instruction 9A,[11] which emphasizes that a mere buyer-seller relationship is insufficient to establish a conspiracy to distribute cocaine.

---

**11.** Instruction 9A given by the court reads as follows:

> As to all defendants, and with regard to Count I, the conspiracy charge, you are instructed that a person does not become a member of a conspiracy to distribute cocaine or possess with intent to distribute cocaine merely because he or she purchased cocaine from an alleged coconspirator or sold cocaine to an alleged conspirator. You are also instructed that joint possession of cocaine in and of itself does not prove a conspiracy to distribute cocaine or a conspiracy to possess with intent to distribute cocaine. Nor does such joint possession standing alone establish that such persons were members of a conspiracy. You are also instructed that the relationship between a buyer and seller of cocaine does not alone establish a conspiracy to distribute cocaine or possess with intent to distribute co-

caine. Similarly, such a buyer/seller relationship standing alone does not establish that such persons were members of a conspiracy.

> As to the first and second elements on the first page of Instruction 8, the government must establish as a part of proving these elements that the defendant had some interest in the success of the alleged conspiracy.

> Therefore, in determining whether a particular buyer or seller of cocaine had an interest in the success of a conspiracy to distribute cocaine or possess with intent to distribute cocaine, you may consider all the circumstances related to that particular buyer or seller, including the number of purchases or sales, the quantity purchased, and any evidence that the buyer or seller expected to make additional purchases or sales.

(R. at 312.)

In *Cabbell,* we rejected the defendant's argument that the district court erred by failing to instruct the jury that the mere existence of a buyer-seller relationship alone was insufficient to establish a conspiracy and we approved the following instruction as being consistent with Eighth Circuit law:

> You are instructed that transient sales where the buyer is purchasing drugs for his own personal use and not for the purpose of distributing or delivering the purchased drugs to others does not in and of itself make the buyer a co-conspirator with the seller in the seller's drug distribution conspiracy. If, however, the buyer acquires the drugs from the seller intending to distribute or deliver the drugs to another person instead of using them for his or her own personal use, or if he or she purchases drugs from the seller as part of a continuing buyer/seller relationship, he or she may be, depending upon what the evidence shows, a co-conspirator with the seller in a drug distribution conspiracy. In order to prove that the buyer and seller were co-conspirators, the government must prove that they had an understanding about or agreed upon one or more of the alleged illegal common goals of the charged conspiracy. In determining whether or not they had such an understanding, you may consider all of the evidence concerning their relationship, including the frequency or infrequency with which they may have engaged in transactions, the quantities of drugs involved, if any, the course, duration, and extent of their conduct, if any, and any knowledge either had of the other's activities.

35 F.3d at 1259 n. 1. The substance of instruction 9A in the case at bar is similar to and consistent with the principles outlined in the *Cabbell* instruction. Thus, we conclude that instruction 9A correctly stated the law and also sufficiently covered the substance of Brown's proposed instruction.

 Brown also argues that the district court erred by failing to define the term "interest" as it is found in Instruction 9A. That instruction required the government to prove "that the defendant had some interest in the success of the alleged conspiracy." (R.

at 312.) Brown argues that the instruction is misleading and an inaccurate statement of the law and that the district court should have either defined "interest" or instead substituted the phrase "had some interest or stake." However, *Webster's Third New International Dictionary* defines "stake" in part to mean "interest." *Webster's Third New International Dictionary* 2220 (1986). Thus, Brown's suggested substitution offers no clarification and, further, Brown offers nothing in support of his argument that the instruction is an inaccurate statement of the law. Moreover, as the able district judge observed, the Seventh Circuit approved a similar instruction in a case where the defendants claimed to be merely drug purchasers rather than members of a conspiracy to distribute cocaine. *See United States v. Grier,* 866 F.2d 908, 933 (7th Cir.1989) (approving instruction which stated that in order for jury to find defendant to be a member of drug distribution conspiracy, defendant must "have some interest in [the conspiracy's] success"). We believe that the term "interest" as it is used in instruction 9A is a correct statement of law, is not ambiguous, and that the substance of the instructions as a whole renders the meaning of this term sufficiently clear.

David Fregoso argues that the district court erroneously failed to include his proposed instruction, which states that "[p]roof of possession of a small amount of a controlled substance, standing alone, is an insufficient basis from which intent to distribute may be inferred. The amounts represented by Exhibits 10a, 10b, 10c and 29a are considered small amounts." (R. at 297.) The district court declined to give this instruction because the court believed that the determination of whether a quantity of cocaine is suitable for personal use or distribution is an issue for the jury to resolve and, further, counsel for Soria objected to the proposed instruction on the basis that it was misleading.

 After carefully reviewing the record, we believe that the district court did not abuse its discretion in declining to give Fregoso's requested instruction. Although the first sentence, taken verbatim from *United*

*States v. Franklin,* 728 F.2d 994, 999 (8th Cir.1984), is an accurate statement of the law, we conclude that the substance of this instruction was adequately addressed in the other instructions, and we further agree with the district court that the second sentence invades the province of the jury to determine whether a quantity is suitable for "personal use" or for distribution. The instruction did not prevent David Fregoso's counsel from arguing in closing, which he did, that certain quantities of cocaine were inconsistent with amounts suitable for distribution. Therefore, the district court did not err in refusing to give Fregoso's proposed instruction.

### F.

In a related issue, David Fregoso contends that the district court erred by failing to grant a mistrial or sever the proceedings after Brown's expert (a former drug smuggler) testified concerning how cocaine is processed down the chain of distribution as well as what quantities of cocaine are suitable for distribution. He also testified that Mexico was one of his primary sources of cocaine when he smuggled drugs. Fregoso contends that the result of this testimony was to drive a wedge between Brown and the other defendants, which was exacerbated due to the fact that the other defendants were of Mexican descent.

■■■ "We will affirm a district court's ruling on a motion for a mistrial absent an abuse of discretion." *United States v. Adams,* 37 F.3d 383, 384 (8th Cir.1994). Likewise, we review the district court's denial of a motion for severance for an abuse of discretion which resulted in "severe or compelling prejudice." *United States v. Rimell,* 21 F.3d 281, 289 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 453, 130 L.Ed.2d 362 (1994).

■■■ In this case, the district court did not abuse its discretion by denying Fregoso's motion for a mistrial and his motion to sever the proceedings after this testimony. First, the court gave a limiting instruction to the jury that it should consider the expert's testimony only as it applied to Brown. We assume, as we must, that the jury followed the court's instruction. *See Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979). Second, we agree with the district court's assessment that this testimony was similar in kind to that which was earlier presented by the prosecution. Finally, Fregoso has failed to establish any prejudice flowing from this testimony; rather, he makes the bare and unsupported assertion that he was harmed by it. Therefore, the district court did not abuse its discretion in declining to grant David Fregoso's motion to sever or for a mistrial.

### G.

Finally, Brown contends that the district court made several errors with respect to his sentence. He first argues that the district court erred in calculating the drug quantity attributable to him by including amounts of cocaine that he personally consumed or intended for personal consumption. He contends that because the offense charged was a conspiracy to distribute cocaine, quantities acquired for his personal use had no relationship to the conspiracy.

■■■ As Brown acknowledges, we rejected this argument in *United States v. Brown,* 19 F.3d 1246 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 100, 130 L.Ed.2d 49 (1994), holding that "the district court did not err by including in its drug quantity finding [on a conspiracy charge] the cocaine base [the defendant] purchased for his personal use." *Id.* (citing *United States v. Innamorati,* 996 F.2d 456, 492 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993)). As the *Innamorati* court observed, while "[p]urchases by an addict or casual user for personal use may not automatically make one a member of a conspiracy to distribute," when the evidence establishes that there was a conspiracy and that the defendant was a member, then the "defendant's purchases for personal use are relevant in determining the quantity of drugs that the defendant knew were distributed by the conspiracy." *Innamorati,* 996 F.2d at 492.

■■■ The evidence in this case indicates that a conspiracy existed and that Brown was a member. Therefore, the district court

committed no error by including in its drug quantity calculation the cocaine that Brown purchased for his personal use.

 Brown also argues that he was entitled to a four-level reduction in his offense level under U.S.S.G. § 3B1.2(a) for his role in the offense because he was a minimal participant in the conspiracy. He claims that he was the least culpable member of the conspiracy because the extent of his involvement in the criminal activities was that he bought cocaine aggressively; he contends that he never sold, supplied, weighed, cut, brokered, or packaged the cocaine. The district court granted Brown a two-level reduction under § 3B1.2(b) after finding that he was a minor participant in the offense, but found that his involvement was too extensive to warrant a four-level reduction for being a minimal participant. A sentencing court's determination of a participant's role in the offense under § 3B1.2 is a factual finding which we review under the clearly erroneous standard. *United ed States v. Olson,* 22 F.3d 783, 787 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994).

Section 3B1.2(a) permits a court to decrease a defendant's offense level four levels "[i]f the defendant was a minimal participant in any criminal activity." Note 2 states that such a departure should rarely be granted and is appropriate in circumstances such as where a defendant is involved in a single drug transaction. U.S.S.G. § 3B1.2, comment. (n. 2).

 In this case, the district court found that Brown did not qualify as a minimal participant in the conspiracy "because his actions spanned the entire time period of the conspiracy and involved numerous cocaine transactions among himself, Buck, Cymbalista, and Cox." (R. at 92.) The court also determined that Brown loaned money to Buck for bail and also served as a de facto guarantor of her drug debts. After carefully reviewing the record, we cannot conclude

that the district court was clearly erroneous in refusing to categorize Brown as a "minimal participant" under § 3B1.2(a).

### III.

For the reasons enumerated above, we affirm the judgments of the district court.[12]

---

**12.** After carefully examining the record, we reject as frivolous the Fregosos' argument that the magistrate judge conducted pre-trial hearings and considered evidence from hearings which the defendants were not permitted to attend. The record simply does not show that the Fregosos were precluded from attending hearings and examining witnesses. The one example offered by the Fregosos as support for this claim involves a co-counsel's examination of a prosecution witness that the Fregosos were permitted to examine several days later.