UNITED STATES of America, Appellee,

v.

Jerome WILLIAMS, Appellant.

UNITED STATES of America, Appellee,

v.

Zachary MARSHALL, Appellant.

UNITED STATES of America, Appellee,

v.

Darryl PRICE, Appellant.

Nos. 95–2170, 95–2171, 95–2173.

United States Court of Appeals,
Eighth Circuit.

Submitted April 9, 1996.

Decided Sept. 13, 1996.

Rehearing Denied Oct. 17, 1996.

Paul J. Passanante, St. Louis, MO, argued, for appellant Jerome Williams.

Barry A. Short, St. Louis, MO, argued, for appellant Zachary Marshall.

Howard B. Eisenberg, Milwaukee, WI, argued, for appellant Darryl Price.

Dean Hoag, Asst. U.S. Atty., St. Louis, MO, argued, for appellee.

Before FAGG, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Zachary Marshall, Darryl Price, and Jerome Williams appeal their convictions under the Federal Kidnapping Act, 18 U.S.C. § 1201(a)(1) (1994), for kidnapping Richard Harris and conspiracy to kidnap him. All three defendants claim that the district court [1] erred in excluding evidence of a polygraph test conducted on the government's chief witness, Michael Campbell. They also claim that the court erred in admitting evi-

---

1. The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

dence of their possession of guns before and after the conspiracy. Williams makes a similar argument regarding evidence of his possession of drugs. Price argues that there was insufficient evidence that he was a member of the conspiracy or participated in the kidnapping, and that the district court erred in refusing to sever his case from the others. We affirm the convictions.

On June 17, 1990, Richard Harris was abducted in St. Louis, Missouri and taken by car to East St. Louis, Illinois, where he was shot to death and abandoned. The government proved that Williams, Marshall, and Price arranged to have a volunteer policeman kidnap Harris. They met the policeman and traveled with him to East St. Louis, where Marshall and Williams killed Harris.

Earlier that June, Harris's cousin, Vernon Henderson, was shot in the Vaughn Housing Project in St. Louis. Harris visited Henderson in the hospital, then returned to the Vaughn Housing Project armed with a rifle and two handguns. Harris went around the Project "sticking [a] gun up to people's faces and asking who shot his cousin." Harris told his girlfriend, who was at the Project with him, that he was going to kill the person who shot his cousin. The girlfriend testified that sometime after that night at the Project, Harris got the information that "Little Dickie" had shot Henderson. She and Harris knew Darryl Price by the name "Little Dickie."

The government's witness, Michael Campbell, was a volunteer officer of the Beverly Hills, Missouri Auxiliary Police Reserve. He was an acquaintance of Zachary Marshall, Jerome Williams, and Darryl Price. Beginning on May 16, 1990, Campbell made a series of gun purchases in which he used his police identification to get gun permits, took money from Marshall and Williams, and bought guns for their use. On May 16 Campbell bought a Taurus nine millimeter pistol; he testified, "I purchased this weapon ... for the protection of [Williams] and his drug trade...." On May 31, 1990, he bought three more guns: a .45 caliber Uzi, a Desert Eagle .44 magnum, and a .357 magnum. Marshall gave Campbell $2,200 in cash to buy the guns, and Marshall and Williams

accompanied him to the gun shop to tell him which guns to get. On June 15, 1990, Campbell got more permits. This time all three defendants accompanied Campbell to the gun shop. He bought two ten millimeter Smith & Wesson pistols; two nine millimeter Beretta pistols; one AK47; and one Ruger rifle with a scope, all for $3,779 in cash provided by Marshall. He turned the weapons over to Marshall and Williams.

On the same day as the last gun purchase, June 15, Campbell went with the three defendants to buy a used Chevrolet Celebrity. Various witnesses testified that the Celebrity looked like a St. Louis police car. Marshall supplied the $2,800 in cash to buy the car, but Campbell actually made the purchase.

The next day, June 16, Marshall paged Campbell and asked him to come to a nightclub to meet him. Outside the club, Campbell met Williams and Marshall. They had mounted an antenna on the top of the Chevrolet Celebrity. Marshall told Campbell that someone had been pulling a pistol on thirteen- and fourteen-year-olds in the Vaughn Projects and that Marshall wanted Campbell to pull that person over. Campbell volunteered to use his "police abilities" to pull the person over. Marshall gave Campbell a description of a person they called "Ricky Beers". Williams said he wanted to "pop" Ricky, meaning to shoot him. They offered Campbell $2,000 for his help.

Early the next morning, June 17, Marshall and Williams took Campbell to the area in south St. Louis where Harris lived and showed him Harris's apartment and car. Campbell began surveilling Harris's apartment, sitting in the Chevrolet Celebrity. Marshall gave Campbell a mobile phone to maintain communication with him.

By mistake, Campbell stopped the wrong man, Kenneth Draper. Campbell flashed a red light and identified himself as a police officer. He told Draper to get in the back seat of the car, gave him handcuffs, and told him to handcuff himself. Draper testified at trial that Campbell called him "Ricky" and was talking to someone on a portable phone. Campbell took Draper downtown. There, they met Williams, who told Campbell he had

the wrong man. Campbell crossed the Mississippi and let Draper out of the car in East St. Louis. He returned to St. Louis to continue surveilling Harris's apartment.

Campbell soon apprehended Harris, who was in a car with his family. Campbell followed the same procedure he had used with Draper, stopping Harris by using a flashing light, and having Harris get in the back seat of the Celebrity and handcuff himself. Using the portable phone, Campbell telephoned Marshall and told him that he had Harris; Marshall said to bring him downtown. Campbell again drove downtown, where he met Williams, Marshall, and Price, who were in another Chevrolet Celebrity. At Williams's direction, Campbell then drove over the bridge to East St. Louis, with the other Celebrity following. Campbell stopped in East St. Louis and walked back to talk to the others. He said, "Whatever you want to do, let's do it right here...." The others told him to keep driving. He got back in the car and continued driving. Campbell was looking for a rural area, but when he pulled into Church Lane, the second car bumped Campbell's car from behind. Harris looked back at the second car and said: "That's Dickie" or "That's Dickie and Zac and them" and "They gonna kill me." Harris jumped out of the car and ran. Marshall got out of the second car and shot Harris twice. Harris fell. Williams then got out of the car. He and Marshall both shot Harris repeatedly.

Price moved to the driver's seat in the second car. Marshall and Williams got back in the car, and both cars sped away.

About an hour or hour and a half later, Williams paged Campbell and arranged a meeting. Price also attended the meeting. Price and Williams paid Campbell his $2,000. Williams told him to have the Celebrity he had used in the kidnapping painted and to get rid of the license plates and antenna, which he did. Williams also warned him not to talk about what had happened or he would get "knocked." Campbell asked what had become of the guns used to shoot Harris, and Williams said they had thrown them into a field.

On June 20, St. Louis police arrested Williams for brandishing a handgun. The handgun turned out to be the Desert Eagle .44 magnum Campbell had bought for Williams and Marshall. Marshall paged Campbell to warn him that a gun registered to him had been seized. He advised Campbell to report the other guns as stolen. Accordingly, Campbell filed a false police report with the Hazelwood police department, saying several guns had been stolen from his car.

Later that same day, June 20, Williams paged Campbell. They met and discussed Williams's arrest. Williams told Campbell that Harris had been a drug rival and that Harris was going to kill Marshall and Price because Price had "shot a guy" in the projects. Campbell retrieved from Williams two of the guns he had bought for the group.

Campbell's report of the stolen guns came to the attention of the Beverly Hills police chief, Joe Collins. Chief Collins knew Campbell had financial problems and was surprised that Campbell would own so many expensive guns. He called Campbell in to ask him about it. After talking to Campbell, Chief Collins concluded the theft report was false and told Campbell to bring the guns in. Chief Collins took Campbell's badge and police identification card and placed him on suspension. Chief Collins told Campbell to bring the guns in to the station. When Campbell returned to the police station with two of the guns, he was arrested.

On August 3, Williams was again arrested, this time with two pistols in his waistband. The serial numbers had been drilled off, but a specialist in firearms identification was able to raise part of the serial number on each gun. His results indicated the serial numbers on these guns were consistent with the serial numbers for two of the pistols Campbell had bought for the group.

Ballistics evidence indicated that all the bullets recovered from Harris's body, except one, were fired from the same .45 caliber gun. The ballistics expert could not identify the caliber gun from which the other bullet was fired, although it could have been a nine millimeter. Police recovered .45 caliber and 9 millimeter shell casings from the scene of

the murder. The government recovered five of the eight pistols Campbell bought for the group, but not the .45 caliber Uzi or the second 9 millimeter Beretta. The police never recovered the murder weapons.

Williams, Marshall, and Price were indicted for conspiracy to kidnap Harris and for kidnapping him. Williams and Marshall were also charged with kidnapping Draper. All were convicted on both counts pertaining to Harris and sentenced to life imprisonment. Williams and Marshall were acquitted of kidnapping Draper.

## I.

Williams, Price, and Marshall contend that the district court erred in excluding evidence of a polygraph test the FBI conducted on Michael Campbell, which he failed. In an in limine hearing on the government's motion to exclude, the appellants tried to lay a foundation for the polygraph evidence based on the principles enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The only expert they called was the FBI agent who administered the test, Agent Napier. Agent Napier was unable to answer questions about the literature in the field of polygraphy and did not recognize the name of the polygraphy expert defense counsel asked him about. Napier was qualified as a polygraph examiner, but did not pretend to any expertise about the reliability of polygraph testing. He stated: "I'm an FBI street agent who has been trained in polygraph and has done a number of tests. I don't, I don't write articles."

The test Napier administered to Campbell consisted of nine questions:

Q. Is your last name Campbell?

A. Yes.

Q. Were you born in Missouri?

A. Yes.

Q. When you gave the weapons to those three men, did you know they planned to kill Rickey?

A. No.

Q. Did you live in St. Louis?

A. Yes.

Q. At the time Rickey was shot, did you ever get out of your car?

A. No.

Q. Before 1988, besides those two times, did you ever lie about yourself to look more impressive?

A. No.

Q. Are you more than 21 years old?

A. Yes.

Q. Was Rickey ever in the trunk of that Celebrity?

A. No.

Q. Prior to 1988, did you ever lie about something important to family members?

A. No.

The examiner did not break down the test results to show whether Campbell was deemed deceptive on particular questions, but simply assigned a "deception" result to Campbell's entire performance. The government offered to administer a new test, asking Campbell the questions at the heart of the case: if he shot Harris; if he saw Marshall and Williams shoot Harris; and if he saw Darryl Price drive the getaway car. The government offered to dismiss the case if Campbell failed the retest. Williams and Marshall refused the proposal. The parties' briefs state that Price agreed, but that he and the government never reached a stipulation. There is nothing in the record indicating that Price sought to avail himself of the government's proposal.

The district court excluded the polygraph evidence on the ground that the defendants had failed to present expert evidence on the reliability of polygraphy. The court stated:

The Court finds that the evidence presented this morning has failed to demonstrate that Special Agent Napier qualifies by training and experience as an expert in the field of polygraphy, in terms, in particular, of being able to discuss the field in general, its theory and its reliability. He is, however, qualified as a polygraph examiner.

So the record before this Court provides no expert testimony as to the elements identified in the *Daubert* decision....

The court went on to question the relevance and probative value of the particular examination:

> I also question very seriously whether the type of evidence I heard today would assist the trier of fact even to determine the credibility of Mr. Campbell.
>
> Assuming, however, that this is relevant evidence, I find that it should not be admitted pursuant to [Fed.R.Evid.] 403 because any probative value that it might have is substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury on this particular evidence.

The defendants devote much of their briefs to arguing that the district court should have applied the *Daubert* standard for admission of scientific evidence, rather than the standard used in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). This argument has no merit, since the district court expressly applied the *Daubert* standard and found the defendants had not made the required showing.

■ Price argues that Agent Napier's testimony was sufficient to establish reliability under *Daubert*. *Daubert* instructs that district courts must make a preliminary assessment of whether evidence is scientific. 509 U.S. at 592–95, 113 S.Ct. at 2796–98. The court ordinarily needs to know whether the theory or technique in question can be tested, whether it has been subjected to peer review and publication, whether it has become accepted in the scientific community, and what the rate of error is. *Id.* at 593–94, 113 S.Ct. at 2796–97. Agent Napier did not pretend to be able to opine about these questions. For instance, as to reliability Agent Napier said:

> Q: Are there ways, Agent, to beat the polygraph examination?
>
> A: That depends on your belief in the polygraph. There are people who think they can, and there are people who have developed strategies and techniques for doing it. Do they work? Are they caught in them? I don't know.

Napier's testimony alone is plainly insufficient to enable the court to undertake a *Daubert* analysis.

Marshall contends that the defendants showed that polygraphic evidence was reliable by presenting a notebook of articles and book chapters on the subject to the district court. Williams's counsel quoted from and summarized the writings on the record without any objection from the government. However, no witness identified or discussed the writings by live testimony, deposition, or affidavit. The district court did not refer to the writings except to say that Agent Napier was "unfamiliar with the literature in the field."

■ It is the burden of the party offering the expert testimony to lay a foundation for its admission. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.), ("[T]he party presenting the expert must show that the expert's findings are based on sound science ...."), *cert. denied*, ── U.S. ──, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); *American & Foreign Ins. Co. v. General Elec. Co.*, 45 F.3d 135, 139 (6th Cir.1995). Therefore, Marshall must establish that the record contained the evidence necessary to permit the court to make a *Daubert* determination. Marshall does not address the question of whether learned writings not introduced in conjunction with testimony of any witness can supply the factual basis for a *Daubert* determination that an expert's testimony is based on scientific knowledge.

However, we need not delve into this unbriefed question, because the district court's decision was not solely based on the lack of evidence to support a *Daubert* determination. The court's decision also rested on the alternative ground that this "particular evidence," *i.e.*, the test Napier administered, was more prejudicial than probative and should be excluded under Fed.R.Evid. 403.

■ We review a district court's rulings under Rule 403 for abuse of discretion. *United States v. Barrett*, 937 F.2d 1346, 1348 (8th Cir.1991), *cert. denied*, 502 U.S. 916, 112 S.Ct. 322, 116 L.Ed.2d 263 (1991); *United*

*States v. Bettelyoun,* 892 F.2d 744, 747 (8th Cir.1989).

The questions Napier asked Campbell in this test do not deal with the facts establishing the kidnapping, but have to do with peripheral details about Harris's murder. The government proposed to conduct a second test that would have explored the most critical facts about the murder: whether Campbell saw Marshall and Williams shoot Harris; whether Campbell himself shot Harris; and whether Campbell saw Price drive the get-away car. The defendants rejected the government's proposal to conduct a second test that would go to the heart of the matter and ask these questions directly. Introducing evidence that Campbell failed a polygraph examination on questions relating to the murder without permitting the jury to know whether he could have passed a test asking far more relevant questions would be unfair and misleading. It is, of course, relevant that Campbell was found to be dishonest, no matter what the questions were.[2] Still, in light of the potential for misleading the jury, the district court did not abuse its discretion in ruling that evidence of the first test alone would be more prejudicial than probative. *See United States v. Kwong,* 69 F.3d 663, 667–68 (2d Cir.1995) (questions in particular polygraph examination not sufficiently probative to require admission), *cert. denied,* —— U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996); *United States v. Pettigrew,* 77 F.3d 1500, 1515 (5th Cir.1996) (same); *United States v. Sherlin,* 67 F.3d 1208, 1216–17 (6th Cir.1995) (excluding polygraph evidence under Rule 403), *cert. denied,* —— U.S. ——, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996).

Williams argues that the prosecutor committed misconduct in failing to inform defendant's counsel, until three days before the case was set for trial, that Campbell had undergone polygraph testing. The defendants moved to dismiss the case because of the tardiness of the revelation. The assistant United States Attorney trying the case stated that he was not aware of the polygraph report earlier, although he apparently approved the testing. The case was set for trial on January 3, 1995. The court denied the defendant's motion to dismiss, but did continue the case until January 17 to give the defendants the opportunity to react to the tardy revelation of the polygraph examination. On January 13 the court conducted an in limine hearing on the government's motion to exclude evidence of the polygraph examination. The court decided to exclude the evidence. The district court acted within its discretion in granting defendants a continuance, rather than dismissing the case. *See* Fed.R.Crim.P. 16(d)(2); *United States v. Tibesar,* 894 F.2d 317, 319 (8th Cir.) (district court's sanctions under Rule 16(d)(2) reviewable for abuse of discretion), *cert. denied,* 498 U.S. 825, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990).

Williams argues that it was an ethical violation to offer Campbell's testimony when he had failed a polygraph test. This argument is hardly viable after we have affirmed the district court's decision that the polygraph results were not admissible. Further, even if we assumed the polygraph results were conclusive proof Campbell was lying during the test, the questions Napier asked in the examination were peripheral and would not prevent Campbell from testifying as to the crucial facts establishing the defendants' guilt. The questions asked in the original test were not sufficiently on point to indicate that the government elicited perjury in calling Campbell at trial.

## II.

The defendants argue that the district court erred in admitting evidence of their prior bad acts in violation of Fed. R.Evid. 404(b). We review the district court's Rule 404(b) rulings for abuse of discretion. *United States v. DeLuna,* 763 F.2d 897, 913 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985).

First, the defendants contend that the district court violated Rule 404(b) in admitting evidence that they killed Harris,

---

**2.** Though relevant, evidence that Campbell was not always truthful was cumulative in the context of the trial as a whole.

when they were only charged with kidnapping and conspiracy to kidnap. Rule 404(b) only forbids introduction of extrinsic bad acts whose only relevance is to prove character, not bad acts that form the factual setting of the crime in issue. *United States v. Bass,* 794 F.2d 1305, 1312 (8th Cir.), cert. denied, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986); *United States v. Swinton,* 75 F.3d 374, 377–78 (8th Cir.1996). As in *United States v. Tate,* 821 F.2d 1328, 1331 (8th Cir. 1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 712, 98 L.Ed.2d 662 (1988), evidence of acts that form an integral part of the crime charged is not rendered inadmissible merely because the acts are criminal in their own right but have not been charged. Otherwise, the government would be handicapped in presenting a coherent picture of the facts of the crime in issue.

Moreover, the killing was directly probative of the kidnapping. In *Tate,* evidence that the defendant shot two state troopers was admitted in a trial on federal weapons violations. *Id.* at 1329. The court stated, "Certainly, the actual use of the weapons, i.e., the shootings of the state troopers, was relevant to the question of whether Tate knowingly possessed them." *Id.* at 1332. In this case the evidence at trial was that Harris got out of the car and started to run away; the defendants prevented his escape by killing him. This use of force to prevent escape is extremely relevant to show the defendants had custody of Harris against his will. Moreover, the fact that Harris was taken from his family in St. Louis and wound up dead in East St. Louis is evidence that demonstrates he was transported across the state line. By the same token, evidence that the defendants disposed of Harris tends to prove that they had him in the first place.

■ Similarly, we reject the defendants' claim that the district court erred in allowing

proof of the series of gun purchases and Williams's subsequent possession of three of the guns Campbell bought. Proof that Campbell bought the group several 9 millimeter pistols and a .45 caliber Uzi is certainly relevant, since Harris's body was full of .45 bullets, and spent .45 and 9 millimeter casings were recovered from the crime scene. Although the guns the police recovered were not the murder weapons, Campbell bought the group a .45 and a 9 millimeter pistol that were never recovered. This shows the defendants possessed guns of the type used in the crime.

■ Additionally, proof that all of the defendants participated in buying guns with Campbell and that Williams possessed the guns Campbell bought ties the defendants to Campbell. More particularly, it shows a common pattern of abusing Campbell's police credentials for illicit purposes. Since Campbell's involvement in the kidnapping was well established, evidence linking the defendants with Campbell tends to prove identity of the other participants in the kidnapping.[3]

■ Finally, the evidence that Williams was apprehended with drugs was relevant to prove the government's theory of the motive for the kidnapping—that Harris was a rival drug dealer. Campbell testified that Williams told him they killed Harris because Harris was a rival drug dealer who was going to kill Marshall and Price. Evidence of other bad acts may be admissible to prove motive. Fed.R.Evid. 404(b).

Thus, each of the types of evidence the defendants claim to have violated Rule 404(b) was legitimately probative of the kidnapping and conspiracy charged. The district court did not abuse its discretion in so determining or in concluding that the probative value of the evidence outweighed its prejudicial effect.

---

**3.** Price argues that proof of the gun purchases before the date of conspiracy stated in the indictment was an amendment or variance to expand the scope of the conspiracy. This argument misses the mark because the gun purchases were relevant, not to show the guns were purchased as part of the conspiracy, but to establish identity of the people who kidnapped and shot Harris. In ruling to permit this evidence, the district court stated that the gun purchases showed "opportunity", in other words, that the defendants had the right kind of guns to have been the murderers. The court adopted the word "opportunity" from the government attorney's argument that the gun purchases "go to the means and opportunity to commit the crime [and] also go to the identification of the defendants."

## III.

█ Price contends that there was insufficient evidence to convict him of conspiracy to kidnap. On review of a conviction, we must view the evidence in the light most favorable to the government. *United States v. Smith,* 32 F.3d 1291, 1293 (8th Cir.1994).

█ To convict Price of conspiracy, the government had to present evidence that Price entered an agreement with one or more other persons to commit the kidnapping. *Id.; United States v. Foote,* 898 F.2d 659, 663 (8th Cir.), *cert. denied,* 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 307 (1990). The agreement need not be proved by direct evidence, but can be shown wholly by circumstantial evidence and inference. *Smith,* 32 F.3d at 1293. Once the conspiracy between Marshall, Williams, and Campbell was established, "only minimal evidence was required to connect [Price] with it." *Id.*

█ There was evidence at trial that the purpose of the kidnapping was to protect Price from Harris's plan to avenge his cousin. Campbell telephoned Marshall once he had kidnapped Harris, and Marshall told Campbell where to take Harris; at this rendezvous spot, Campbell met Marshall, in the same car with Williams and Price. From these facts indicating that Price was in the car as Marshall was giving Campbell directions, the jury could infer that Price knew he was on his way to a kidnapping being conducted for his benefit and that he came along to help. After the two cars passed into East St. Louis, Campbell stopped his car and suggested that they do whatever they were going to do there. However, the others said to keep driving, which manifests a continuing agreement to keep custody of Harris. Once Williams and Marshall shot Harris, Price moved into the driver's seat and sped away from the crime scene. The fact that Price took charge of the conspirators' escape from the scene of the crime adds to the weight of the evidence that he participated in the conspiracy. *See Smith,* 32 F.3d at 1294 (defendant's evasive measures as he drove drug dealer away from scene of transaction were properly considered in assessing the sufficiency of the evidence of conspiracy). Finally, Campbell testified that after getting away from the scene of the crime, he met Williams and Price, who paid him the $2,000 he had been promised and gave him instructions about disguising the Celebrity.

We conclude that the evidence of Price's affirmative actions is adequate to prove that he "knowingly contribute[d] his efforts to the conspiracy's objectives." *Id.* (quoting *United States v. Duckworth,* 945 F.2d 1052, 1053 (8th Cir.1991)).

Price argues that there is insufficient evidence to convict him of kidnapping without co-conspirator hearsay. Since we have concluded that there is sufficient evidence that he formed a part of the conspiracy, this argument fails.

## IV.

█ Price also contends that the district court erred in denying his request for a severance. A district court's refusal to grant a severance will not be reversed, absent an abuse of discretion that prejudiced the defendant's rights. *United States v. Akers,* 987 F.2d 507, 512 (8th Cir.1993). Here, Price and his co-defendants were charged with the same crimes, including conspiracy, which had to be proved by the same evidence. Joint trial is generally favored in such cases. Fed. R.Crim.P. 8(b); *Akers,* 987 F.2d at 512; *DeLuna,* 763 F.2d at 919. Price has made no showing of abuse of discretion or of prejudice.

We affirm the convictions.