# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 98-1506

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United |
| | * | States District Court for |
| v. | * | the Western District of |
| | * | Missouri. |
| Joel R. Jordan, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 9, 1998

Filed: July 27, 1998

_____

Before, WOLLMAN and MURPHY, Circuit Judges, and KYLE, District Judge.[1]

KYLE, District Judge.

A jury convicted Joel Jordan ("Jordan") of conspiring to make and pass counterfeit Federal Reserve Notes, in violation of 18 U.S.C. § 371, and of aiding and abetting the making of counterfeit Federal Reserve Notes, in violation of 18 U.S.C. §§

_____

[1] The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

471 & 472 .  The district court sentenced him to forty-five months imprisonment.[2]
Jordan challenges both his convictions and his sentence.  We affirm.

## I.  Background

The evidence, viewed in a light most favorable to the verdict, indicates that Jordan was involved in a ring that distributed a large amount of counterfeit Federal Reserve Notes throughout the Kansas City, Missouri area.  These Notes shared many of the same characteristics, including face plate numbers and seals, duplicate serial numbers, poor quality ink-jet copies, a shiny appearance, and the same paper quality.  During its investigation, the Secret Service recovered a total of $90,000 in counterfeit  Notes containing these characteristics.

In October 1996, Jordan's friend Jack Hurd ("Hurd") approached him about selling counterfeit money.  Jordan found a buyer for the counterfeit money, Oscar Witmore ("Witmore"), who wanted $30,000 worth of counterfeit bills.  Hurd then brought Jordan $30,000 worth of counterfeit $50 bills, which  Jordan sold to Witmore for $3,000.  Of the proceeds, Jordan received $1,000 and Hurd received $2,000.

Shortly thereafter, Witmore told Jordan that he wanted $30,000 worth of counterfeit $20 bills.  Hurd gave Jordan $30,000 worth of counterfeit $20 bills, which he sold to Witmore for $3,000.  Again, Jordan received $1,000 for the sale and  Hurd received $2,000. A few days later, Witmore complained to Jordan about the quality of the $20 bills he had received.  Both Witmore and the person to whom he had sold the money were unhappy with the quality of the bills.  Witmore returned about $21,000 worth of counterfeit $20 bills to Jordan.  Jordan then gave the bad money to Hurd, who

---

[2]    The Honorable D. Brook Bartlett, Chief Judge, United States District Judge for the Western District of Missouri, was assigned the case prior to trial and issued an order regarding the admission of Jordan's confessions.  The Honorable Ortrie Smith, United States District Judge for the Western District of Missouri, conducted the trial and sentenced Jordan.

gave him $20,000 in counterfeit $20 bills to replace the poor quality bills. Jordan gave these $20 bills to Witmore. Subsequently, Witmore asked Jordan for another $30,000 in counterfeit bills. Jordan received the counterfeit money from Hurd, which he sold to Witmore for $3,000.

Jordan also sold counterfeit money, at 10 cents on the dollar, to "JI" on four occasions. The first transaction involved $3,000, the second $7,000, and the third and fourth involved $2,500 each. The last two times, Jordan cut the money himself and kept all of the profits.

Jordan told his girlfriend, Natasha Hodge ("Hodge") that he was making counterfeit money, and he gave her three counterfeit $20 bills. Hodge saw Jordan print counterfeit money on a color copier at his house and use a paper shredder to dispose of poor quality copies. On one occasion, Hodge witnessed a fight between Jordan and Hurd over counterfeit money that Hurd had printed, but Jordan had disposed of because he thought it was of low quality.

In addition to distributing counterfeit money, Jordan bought cotton fiber paper and colored inks for making counterfeit money. Hurd gave Jordan money to buy these supplies on at least six separate occasions. In January 1997, Hurd came to Jordan's house and asked him to pawn the copier that Hurd was using to make counterfeit money. Jordan took Hurd to a pawn shop, where Jordan pawned the copier for $250.

## II. Admissibility of Jordan's Confessions

Jordan contends that the district court improperly admitted into evidence two statements that he had given to the police regarding his involvement in counterfeiting activities.

The record reveals that the police obtained the first statement on the night of January 22, 1997, after going to Jordan's house at approximately 3:00 a.m. and asking

him if he would be willing to speak with them.[3] Jordan agreed to go with the police to the Kansas City police station, and he was given the option of driving himself or riding with the police. Jordan chose to ride in the police car, and on the way to the station, he was read his Miranda rights. During the interview, Jordan explained the counterfeiting operation to Agent Cohen and Detective Kaminski, naming participants and describing transactions. That night, Jordan gave the police a written statement in which he admitted distributing $125,000 in counterfeit currency. As Agent Cohen drove Jordan back home after he had given this statement, Jordan agreed to speak to the Secret Service agents.

Jordan gave a second statement to the authorities on January 24, 1997. Jordan initially spoke with Agent Redpath after signing a Warning of Rights and Consent to Speak form. Jordan told Redpath that he had bought colored inks and 25% cotton fiber paper for making counterfeit money, and that he had pawned a color copier used for counterfeiting. Jordan then spoke with Agent Cohen, giving him a signed statement containing, inter alia, the information that he had given to Agent Redpath.

The voluntariness of a confession is a question of law that this Court reviews de novo. United States v. Valdez, Nos. 97-4075, 97-4050, 1998 WL 276315, at *2 (8th Cir. June 1, 1998). A district court's factual findings about the circumstances surrounding a confession, however, are reviewed for clear error. Id. A confession is involuntary if it was "extracted by threats, violence, or direct or indirect promises, such that a person's will is overborne and his or her capacity for self-determination critically impaired." United States v. Gipp, No. 97-2327, 1998 WL 304900, at *2 (8th Cir. June 11, 1998). In making this determination, we look at the totality of the circumstances, including "the conduct of law enforcement officials and the suspect's capacity to resist

---

[3] The police visited Jordan's home at such a late hour because they had apprehended another suspect in the counterfeiting ring during the evening of October 22, 1997, and they did not want this individual to contact Jordan from jail and warn him that the police knew about their operation.

pressure." United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996).

Jordan argues that his confession was involuntary because the police first approached him about talking with them in the middle of the night, and because the agents made indirect promises that he could go home if he cooperated and confessed. He contends that his will was overborne by the fact that he needed to get to work only a few hours after the police arrived at his house, and he was afraid that his employer would discover that the police had questioned him about counterfeiting.

The district court properly determined that both of Jordan's confessions were voluntary. Looking at the totality of the circumstances, we are satisfied that the record clearly reflects that the police did not obtain either of Jordan's two confessions by overpowering his will or impairing his capacity for self-determination. Moreover, Jordan has not identified any actions or statements by the police to support his contention that the police implicitly promised him that he could go home and go to work if he confessed.

The record reveals that the police approached Jordan at his home and that Jordan voluntarily agreed to speak to them about counterfeiting activities in which he was involved. The police read Jordan his Miranda rights before they talked to him, and they did not take him into custody. See Mendoza, 85 F.3d at 1350 (noting that the fact that Miranda warnings were given "weighs in favor of a voluntariness finding"). Jordan cooperated during both interviews, and the police made no threats or promises to him. See Lovejoy v. United States, 92 F.3d 628, 633 (8th Cir. 1996) (finding that confession was voluntary, in part because no threats or promises were made to the defendant during the interview). In light of Jordan's admission that "he went freely with [the officers] to the station" on the night of January 22, 1997, (Appellant's Br. at 18), we do not believe the fact that the police approached Jordan in the middle of the night renders his confession involuntary. See United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (noting that "intoxication and fatigue do not automatically render a confession involuntary"). Thus, Jordan's confessions were properly admitted at trial.

-5-

## III.  Exclusion of Polygraph Testimony

Jordan argues that the district court erred in excluding the results of a polygraph test that Jeannettea Jones ("Jones"), his co-defendant, had taken.  Jones pled guilty before trial, but was not called as a witness because she was in the hospital at the time of Jordan's trial.  (Tr. 143-44, 155.)

Agent Redpath administered a polygraph test to Jones before trial; the results indicated that her responses were deceptive.  After this test, Jones gave a second statement to the police, in which she revealed that she had passed more counterfeit money than she had previously disclosed.[4]  Agent Redpath asked Jones to take a second test, but she did not do so.

The district court conducted an evidentiary hearing on the issue of the admissibility of Jones' polygraph test.  It excluded the results of the test because: (1) Jordan waived this issue by failing to raise it in a motion in limine before the magistrate judge, as required by the Omnibus Order; (2) the polygraph evidence did not meet the standards of admissibility for scientific evidence under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993); and (3) the evidence was more prejudicial than probative under Federal Rule of Evidence 403.  (Tr. at 138-39.)

We review a district court's decision to admit or exclude evidence pursuant to either Daubert or Rule 403 under an abuse of discretion standard.[5]  General Elec. Co.

---

[4]  At the hearing on the admissibility of Jones' polygraph test, Agent Redpath testified that a polygraph test may indicate deception where a person is holding back information, rather than lying.  Thus, Jones' test could have indicated deception because she had not told the police the full amount of counterfeit money that she had passed, rather than because she lied when  answering the questions during the test.

[5]  We believe that the district court could have properly excluded the polygraph evidence based solely on the fact that Jordan failed to raise the issue in a timely fashion.  However, we also choose to address the substantive reasons upon

v. Joiner, 118 S. Ct. 512, 515 (1997); United States v. Williams, 95 F.3d 723, 729 (8th Cir. 1996), cert. denied, 117 S. Ct. 750 (1997).  In Williams, this Court held that the district court did not abuse its discretion in excluding the results of a polygraph test given to a government witness, where that witness failed an initial polygraph test involving questions peripheral to  the charges against the defendant, and then refused to take a second test involving questions directly related to those charges.  95 F.3d at 730.  We found that it was within the discretion of the district court to determine that admitting the results of only the first test would have been more prejudicial than probative.  Id.

We find the instant case similar to Williams.  Here, Jones took an initial polygraph test, the results of which indicated deception.  However, she did not take a second test which would have clarified whether her earlier test was tainted by the fact that she had not told the police the full amount of counterfeit money that she had passed.  Under these circumstances, the district court did not abuse its discretion when it determined that admitting the results of this one test would have been more prejudicial than probative.  See Williams, 95 F.3d at 730.

## IV.  Government's Use of Allegedly Perjured Testimony

Jordan argues that a government witness, Tracy Henderson ("Henderson"), perjured himself during the trial, and that the government knew, or should have known, that his testimony was false.  Jordan contends that Henderson perjured himself on cross-examination when he testified that he saw Jordan with $500 in counterfeit money at a craps game. (Tr. at 103.)  In a previous statement to the police, Jordan indicated that he had seen Jordan with $30,000 in counterfeit money at this game.  Jordan also contends that Henderson perjured himself when he gave conflicting testimony at trial.  Initially, Henderson stated that, while he was gambling with Jordan,  he had seen

---

which the district court excluded this evidence.

Jordan pick up counterfeit money that had been dropped into a pool of beer, and the ink on it had run. (Id.) Later in his testimony, Henderson stated that he only had seen Jordan with the counterfeit money, and not that he had seen him pick it up from the pool of beer. (Id. at 112.)

"The government may not use or solicit false evidence, or allow it to go uncorrected." United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995) (citation omitted). In order to prove that the government used false testimony, Jordan must establish that: (1) the government used perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the perjured testimony could have affected the jury's judgment. United States v. Payne, 119 F.3d 637, 645 (8th Cir.), cert. denied, 118 S. Ct. 454 (1997).

The Court finds that Jordan has failed to prove that the government used false testimony. Jordan argues that Henderson's testimony was false because it differed from a prior statement that he had given to the police and because it was contradictory. "A challenge to evidence through another witness or prior inconsistent statements is insufficient to establish prosecutorial use of false testimony." Martin, 59 F.3d at 779.

Jordan has also failed to prove that there is a reasonable likelihood that the perjured testimony could have affected the jury's judgment. Henderson was cross-examined about his prior inconsistent statement to the police regarding the amount of counterfeit money Jordan had while they were gambling. Moreover, the government presented substantial evidence against Jordan, including his two, signed confessions. Under these circumstances, we do not believe that Henderson's testimony could have affected the jury's judgment.

## V. Amount of Counterfeit Money Attributable to Jordan

Jordan argues that the district court erred in sentencing him by improperly

calculating the amount of counterfeit money attributable to him. The district court concluded that Jordan was involved with more than $120,000, but less than $200,000, in counterfeit money, and it increased Jordan's base offense level by seven points, pursuant to U.S.S.G. § 2B5.1. This Court reviews the district court's factual determinations upon which it bases its sentence, including the amount of counterfeit money attributable to a defendant, under a clearly erroneous standard. United States v. Lamere, 980 F.2d 506, 510 (8th Cir. 1992).

Jordan told the police that he had distributed $125,000 in counterfeit money.[6] Jordan's own statements, which we have already determined were voluntarily given, provided ample support for the district court's findings.[7]

## VI. Jordan's Role in the Offense

Jordan contends that the district court erred when it enhanced his base offense level by four points for being an organizer or leader of an extensive criminal activity.

U.S.S.G. § 3B1.1 provides for a four-point increase in a defendant's base offense level if he or she "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1. "The terms 'organizer' and 'leader' are to be broadly interpreted." United States v. Bond, 135 F.3d 1247, 1249 (8th Cir.), petition for cert. filed, May 6, 1998. Factors the district court should consider in determining whether an upward adjustment is appropriate

---

[6] In the statement that he gave the police on January 23, 1997, Jordan admitted that he distributed $110,000 to Oscar Whitmore and $15,000 to "JI," and he received $4,500 in return.

[7] Jordan's reliance upon cases involving the issue of whether partially completed or destroyed counterfeit money should be included in determining his sentence are inapposite. The district court did not rely upon the amount of counterfeit money that Jordan shredded in calculating the amount of counterfeit money attributable to him.

include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

United States v. Drapeau, 121 F.3d 344, 350 (8th Cir. 1997), cert. denied, 66 USLW 3772 (1998). This Court reviews a sentencing court's factual determination of a participant's role in the offense for clear error. United States v. Padilla-Pena, 129 F.3d 457, 469 (8th Cir. 1997).

Jordan contends that he was working merely as an employee of Hurd who did what Hurd asked him to do. In addition, Jordan typically received only one-third of the proceeds from the sale of the counterfeit money, while Hurd received two-thirds.

The evidence at trial indicated that Jordan recruited Witmore to distribute counterfeit money and that he knew that Witmore was selling it to others. See United States v. Tran, 122 F.3d 670, 673 (8th Cir. 1997) (finding that defendant's recruitment of others to participate in the conspiracy warranted enhancement for role in the offense). More importantly, however, Jordan exercised decision-making authority over the counterfeiting operation by making counterfeit money, enforcing quality standards, and shredding money when he felt that it was of low quality, even when Hurd felt that the product was acceptable.

Considering the record as a whole, we find that the district court's determination that Jordan was a leader or organizer under U.S.S.G. §3B1.1 was not clearly erroneous.

We affirm both the convictions and the sentence.

A true copy.

Attest:

      Clerk, U.S. Court of Appeals, Eighth Circuit.